Fourth Division
September 20, 2007

No. 1-05-1240

| | | |
|---|---|---|
| JEAN FRIGO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 00 L 11559 |
| SILVER CROSS HOSPITAL AND MEDICAL | ) | |
| CENTER, | ) | Honorable |
| | ) | Donald J. O'Brien, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE NEVILLE delivered the modified opinion of the court:

Defendant, Silver Cross Hospital and Medical Center (Silver Cross), appeals from a jury verdict awarding plaintiff, Jean Frigo, $7,775,668.02 in damages. The jury verdict resulted from a negligent credentialing count based upon Silver Cross granting Dr. Paul Kirchner category II surgical credentials, which authorized the doctor to operate on Frigo's foot and culminated in her foot being amputated. On appeal, Silver Cross presents the following issues for review: (1) whether Frigo's action was barred by the statute of limitation because the negligent credentialing claim raised in the first amended complaint did not relate back to the allegations in the original complaint; (2) whether the negligent credentialing claim was barred by sections 8-2101 and 8-2102 of the Code of Civil Procedure, commonly known as the Medical Studies Act (735 ILCS 5/8-2101, 8-2102 (West 2000)); (3) whether the negligent credentialing claim was barred by the Hospital Licensing Act (210 ILCS

-1-

85/10.2 (West 2000)); (4) whether Frigo failed to prove that Silver Cross was negligent when it granted Dr. Kirchner category II surgical privileges; and (5) whether the trial court denied Silver Cross a fair trial when it used Illinois Pattern Jury Instructions, Civil, No. 30.23 (2006) (hereinafter IPI Civil (2006)) to instruct the jury. We affirm and hold that negligent credentialing is a cause of action that is a progeny of hospital or institutional negligence, which is a cause of action that was first recognized by our supreme court in Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 331 (1965).

## BACKGROUND

On October 6, 2000, Frigo brought a medical malpractice suit against Dr. Kirchner and Silver Cross, and in her original complaint she made allegations of negligence based upon her October 8, 1998, foot surgery. With respect to Dr. Kirchner, Frigo alleged that he should not have undertaken the elective bunion surgery until the ulcer in that area was allowed to heal. With respect to Silver Cross, she alleged both that Dr. Kirchner was its agent and that Silver Cross improperly managed and maintained the hospital. Through discovery, Frigo learned that Silver Cross gave Dr. Kirchner category II surgical privileges even though he did not meet the hospital's requirements for category II privileges. On April 25, 2003, Frigo filed a first amended complaint and included the allegation that Silver Cross was negligent in awarding Dr. Kirchner category II surgical credentials even though he had not completed a 12-month podiatric surgical residency and was not board certified as required by Silver Cross's bylaws and by the Joint Commission for Accreditation of Health Care Organizations' (JCAHO) standards. Frigo further alleged that Silver Cross should not have allowed Dr. Kirchner to care for her and that she would not have been injured if the hospital had not violated its duty.

The Trial

Before the trial, Dr. Kirchner settled with Frigo for $900,000. Frigo proceeded to trial against Silver Cross. Below is a summary of the testimony presented at trial that is relevant to this appeal.

Frigo's Case

Paul Pawlak

Paul Pawlak, Silver Cross's president and chief executive officer, testified that the hospital's board of directors (Board) had the final say in issuing credentials to physicians and that the duty was nondelegable. Pawlak testified that the hospital is governed in part by the medical staff's bylaws, which in turn must be approved by the Board. A physician's application is reviewed by the credentials committee, which forwards its recommendation to the medical staff executive committee, which in turn makes its recommendation to the Board. Pawlak testified that the Board does not usually obtain the physician's file but instead relies on the medical staff.

Pawlak testified that Silver Cross is accredited by the JCAHO. The JCAHO's standards provide for the betterment of healthcare, and they apply to this hospital. Silver Cross, as part of the accreditation process, agrees to abide by the JCAHO standards. The JCAHO standards on credentialing require the hospital Board to take into account the medical staff's recommendations and the hospital's bylaws. The JCAHO's section MS 5.10 provides:

> "The governing body appoints and re-appoints to the Medical Staff
> and grants initial, renewed or revised clinical privileges based on the
> Medical Staff's recommendations in accordance with the Bylaws,
> Rules and Regulations and Policy of the Medical Staff and of the

1-05-1240

hospital."

Pawlak testified that the Board issues credentials in conjunction with the medical staff and has the power to reject its recommendations. The Board bases its issuance of privileges on the medical staff's recommendations and on the bylaws and regulations. The JCAHO mandates that the hospital must follow its bylaws; it cannot follow only its staff's recommendations. Pawlak also testified that the Board at Silver Cross follows the credentialing committee's recommendation if it is positive. However, it does not independently investigate credentials. Pawlak testified that the JCAHO requires that the Board make an independent examination separate from the staff.

Pawlak further testified that the hospital's rules have the same force as its bylaws. The rules and regulations listed the requirements for podiatrists seeking privileges in 1993 (the year after Dr. Kirchner first applied). Before 1993, applicants had to complete an approved surgical residency. For more advanced category II privileges, the hospital's rules required that the applicant be licensed and have completed a 12-month podiatric surgical residency, be accepted and approved by the American Board of Podiatric Surgery (board certification), and submit documentation of prior performance of procedures including at least 30 operative reports.

Specifically, the 1992 rules provided:

> "This category assumes the practitioner has had additional post-graduate surgical training: e.g. completion of approved surgical residency or has become Board Certified by the American Board of Podiatric Surgery, or Board Eligible by the American Board of Podiatric Surgery, and in this instance must submit documentary proof

-4-

of having performed the surgical procedures to the satisfaction of the Department of Surgery."

The 1993 rules provided:

"Any Illinois licensed podiatrist who has completed a 12 month podiatric surgical residency program accepted by the [American Board of Podiatric Surgery] ABPS and approved by the [Council on Podiatric Medical Education] CPME of the [American Podiatric Medical Association] APMA. In addition, the candidate shall have completed successfully the written eligibility examination. Podiatrists requesting this category must submit documentation of prior performance of requested procedures, including 30 Category II operative reports reflecting procedures performed during the past 12 months."

The rules were amended again before the surgery.

Next, Pawlak testified that Dr. Kirchner did not have a podiatric surgery residency and was not board certified. Pawlak testified that he never reviewed Kirchner's application because the medical staff felt that Dr. Kirchner was qualified for category II privileges through a grandfather clause. Pawlak testified that there was no grandfather clause in the rules. He also stated that grandfathering was reserved for physicians with many, many years of experience and that Kirchner did hot have such experience in 1993. The JCAHO provides that at the discretion of the organization, specific information may differ for the information required for reappointment. Pawlak

testified that according to the bylaws and rules, reappointment to the medical staff and continued privileges at Silver Cross are granted only on formal application that occurs every two years. When Kirchner reapplied, he had to submit an application.

### Dr. Richard Kusunose

Dr. Richard Kusunose, Frigo's expert podiatrist, testified that he performed 250 procedures a year during his two-year podiatric surgical residency and almost half of those procedures were bunionectomies. He also described the board-certification process, which involves acquiring a certain amount of experience and passing an examination. Dr. Kusunose testified that he reviewed Dr. Kirchner's surgical logs from his primary care residency, which was significantly different from a surgical residency because it was focused on conservative management with very little exposure to foot surgery. Dr. Kusunose testified that Dr. Kirchner's log showed five to six category II procedures related to the foot, and none of them was a procedure done at Silver Cross in 1998. In only one of the procedures did the resident participate more than 50%. Dr. Kusunose stated that Dr. Kirchner had not completed an approved surgical residency in 1992. Dr. Kusunose also stated that Dr. Kirchner did not meet the credentialing requirements for category II privileges in 1993 or 1998. Kirchner needed the podiatric surgical residency and the written exam for board certification.

Dr. Kusunose testified that "grandfathering" is the situation where an applicant who obtained privileges before a change in the prerequisites is not required to satisfy the new requirements "if that's so delineated in the bylaws." Dr. Kusunose reviewed Silver Cross's bylaws and he stated that there is no mention in them of a grandfather clause.

Next, Dr. Kusunose summarized Frigo's care. Frigo developed an infected ulcer on her left

foot prior to her October 8, 1998, surgery at Silver Cross. He noted that you would not prescribe an antibiotic for an ulceration, as Dr. Kirchner did, if the ulcer was not infected. Thus, prescribing an antibiotic showed that Dr. Kirchner felt the ulcer was infected. The unhealed ulcer was still present at the time of surgery. This surgery was elective and never should have moved forward in the presence of the ulceration. He noted that it had taken 50 years for the bunion to develop and there was no rush to take care of it now, especially in light of the infection. Further, because Frigo was diabetic, that predisposed her to a greater risk of infection. Dr. Kusunose opined that proceeding with this surgery absolutely breached the standard of care. That was especially true in light of the fact that an earlier procedure on the opposite foot proceeded only after the ulcer healed and no complication occurred there. If Dr. Kirchner had not performed the October 1998 surgery, Frigo never would have had the amputation. The surgical incision here went through the infected ulcer and carried the infection into the wound. There were clear signs of infection within a week after Dr. Kirchner's surgery. Dr. Kusunose testified that everyone agreed this patient had osteomyelitis and that it was caused by the infection that was brought about by the incision through the infected ulcer. The podiatrist should have cultured the wound and drained and X-rayed it, and his failure violated the standard of care.

According to Dr. Kusunose, Dr. Kirchner's use of a single screw in that surgery was inappropriate. The patient weighed 280 pounds and she put weight on the foot when she walked. She was allowed to walk, rather than put on a non-weight-bearing device, and the bone fractured during the first week. Walking caused the fracture and allowing Frigo to walk violated the standard of care. After the fracture, the screw no longer served any purpose and should have been removed.

Dr. Kirchner could not remove the screw because he could not find it, and that was because he did not have the training and experience. The doctor's failure was also a deviation from the standard of care. By the time the screw was removed, the bacteria had had five months to grow. The failure here resulted from Dr. Kirchner's lack of experience and his lack of competence, both in doing the surgery and in not being able to recognize and treat the complications that are learned in a surgical residency.

Dr. Kusunose testified that Frigo should have been admitted to Silver Cross immediately for a team approach of care, with the wound opened up and antibiotics started. No team approach was ordered by Dr. Kirchner and that also violated the standard of care. If that had been done, the likelihood is that the infection would have been controlled. He added that this patient did not have Charcot disease and that none of the doctors that treated Frigo made such a diagnosis. He had no way of knowing if he saw all the materials that the credentialing committee considered. Dr. Kusunose testified that he did not know how the credentialing process was performed at Silver Cross but said the process is fairly standard because hospitals all operate under the same JCAHO standards.

Dr. Paul Kirchner

Dr. Paul Kirchner testified that he did a one-year primary care residency after graduating from podiatry college in 1991. He testified that he did do a surgical residency. Dr. Kirchner testified that he submitted his application for full category II privileges at Silver Cross in 1992 and that is all he submitted. He testified that he had not taken the boards as of October of 1995 and was not board certified in podiatry or podiatric surgery at that time. He still had not done a surgical residency when he performed the procedure on Frigo in October of 1998. Dr. Kirchner testified that he had surgical privileges only at Silver Cross.

Dr. Kirchner testified that the year prior, 1997, he had operated on a bunion on Frigo's right foot. He testified that there had been an ulcer on that foot, but it was resolved with antibiotics under the care of a vascular surgeon before that surgery. The next year, on July 13, Frigo presented with a bunion and a diabetic ulcer on her left foot. When she returned on August 10, the area was red and swollen, which he agreed could be consistent with an infection. On September 22, she still had pain and a blister, and Dr. Kirchner prescribed an antibiotic. Dr. Kirchner testified that he performed the category II elective surgery on October 9, 1998. He placed a screw into the top of the metatarsal. At his deposition, he said Frigo had a diabetic ulcer on that foot on the date of surgery, but he denied this fact at trial. The pathology report showed left foot bunion with diabetic ulcer. Dr. Kirchner testified that ulcers can carry bacteria and that such areas can become infected. Four days after the surgery, there was redness and swelling, which can be consistent with an infection. He believed there was infection at the surgical site. An X-ray on November 6 showed the bone had fractured. Dr. Kirchner stated that he corrected the fracture in a closed reduction. He stated that Frigo had cellulitis, not osteomyelitis. Dr. Kirchner testified that he tried but was unable to remove the screw on February 18, 1999, at Silver Cross.

### Dr. Lawrence Mozan

Dr. Lawrence Mozan, Frigo's expert, who was a board-certified surgeon, testified that he analyzed Dr. Kirchner's surgery. Dr. Mozan stated that Frigo had osteomyelitis, which is a bone infection. Dr. Mozan testified that he premised that opinion in part because she was given antibiotics before surgery and that you do not use those unless someone has an infection. He stated that the ulcer was present at the surgery. The infection began with the bacteria in the ulcer and that caused

the osteomyelitis. If you cut through the ulcer, you spread the bacteria. The bacteria also gets on the screw, where it cannot be treated. Leaving the screw in, when a patient has an infection, makes it tremendously more difficult to combat the infection. If the screw had been removed and the infection treated earlier, Frigo's foot could have been saved. Dr. Mozan testified that the elective surgery was the cause of Frigo's amputation.

### Dr. Carl Bakken

Dr. Carl Bakken, Frigo's board-certified expert in internal medicine, infectious disease and emergency medicine, testified that Frigo had osteomyelitis caused by methicillin-resistant staph aureus (MRSA).[1] He opined that the originating event for Frigo's infection was the October 1998 surgery. Dr. Bakken testified that, after the signs of infection, the X-ray showed the fracture and the bleeding caused by it, which in turn became a place where bacteria could grow and led to the infection spreading quickly. No antibiotic was used. Dr. Bakken opined that the originating event for the infection was the surgery performed in the presence of the ulcer.

### Arthur Shorr

Arthur Shorr, Frigo's board-certified expert in health care administration, described how a hospital is managed. Shorr testified that a hospital must be accredited by the JCAHO, which sets the minimum acceptable way to run a hospital. The hospital must have corporate bylaws and medical staff bylaws approved by the hospital board. Shorr testified that the board of trustees has legal responsibility for the hospital. Shorr testified that the JCAHO has a section on credentialing and that

---

[1]Methicillin-resistant staph aureus is a bacteria.

anyone who wants to join the hospital staff must know what the requirements are. Shorr stated that there are criteria for credentialing. When the board is invited to give privileges, the board can rely on the fact that the hospital rules are consistent with the JCAHO's rules, which maximizes patient safety. The chief executive officer reports to the board on credentialing and cannot delegate that duty. Privileges are ultimately granted by the board.

Next, Shorr opined that Silver Cross did not act reasonably when it initially granted category II privileges to Dr. Kirchner. Silver Cross ignored its bylaws. Shorr testified that Dr. Kirchner did not meet the minimum requirements. He was qualified for category I privileges at that time, but category II privileges assume that the practitioner has had additional postgraduate surgical training. Dr. Kirchner spent a year in a residency, but Shorr would not categorize the training as a surgical residency experience because it was more medical than surgical. The hospital's credentialing rule contains three examples of things that might qualify as such additional surgical training. The bylaw does not say that such additional training must be more than modest (Dr. Kirchner had modest surgical training in his residency), but the three examples provide clear guidelines.

Shorr testified that Dr. Kirchner's application for privileges never should have been considered by the board because the application was missing this basic information. Shorr stated that the 1992 rules did not say they required a 12-month surgical residency - that did not appear until the next rule change. Shorr testified that Dr. Kirchner's application should have been sent back to the credentials committee because the rule required definitive training in surgical podiatry. For recredentialing later, Dr. Kirchner required a surgical residency and passing the board-certification exam as a prerequisite for category II privileges. The medical staff had concluded those requirements were the way to

maximize patient safety. Dr. Kirchner never should have been credentialed, pursuant to the bylaws, and he could not do surgery without being credentialed. Shorr stated that the JCAHO's MS section 5 said the information required for reappointment may differ from the information required for appointment. In addition to information reviewed the first time, there may be additional information that is a classical industry-wide interpretation. However, the applicant has to meet the credentials in place when he applies. Here, this podiatrist never met the tightened standards. His reappointment applications never indicated that he met the bylaws' requirements.

Shorr testified that he was familiar with grandfathering, saying "it's a common practice when applied correctly." If a physician is credentialed, and the staff later imposes additional requirements, that physician does not have to meet the new requirements. But the presumption is that the doctor was credentialed correctly in the original credentialing. If the first credentialing is wrong, you do not grandfather someone who did not qualify under the old rules.

Jean Frigo

Jean Frigo testified that she was born in 1948 and that she had been a nurse for 30 years. She testified that she saw Dr. Smith, now her managing doctor, because of the first ulcer on her right bunion and that ulcer was resolved before Dr. Kirchner performed that surgery. She was back to her job as a critical care nurse two weeks after that. She then saw Dr. Kirchner again for her left foot. This time the ulcer was still there when she went for the surgery on October 8, 1998. Frigo testified that she went to Silver Cross because that is where Dr. Kirchner worked. She was not put on crutches after the surgery until after the bone fractured. The pain and swelling in the foot continued and she finally called Dr. Smith, who told her the hardware had to come out. Frigo testified that her

foot was amputated on August 30, 1999. She has not returned to work. Frigo testified that she was not told of Dr. Kirchner's lack of credentials.

### Dr. Robert Eilers

Dr. Robert Eilers, Frigo's physiatrist, testified that he saw her in July of 1999. The diagnosis was left lower extremity bunion surgery complicated by a staph infection and possible Charcot disease. Dr. Eilers testified that Frigo did not have Charcot disease. He described the amputation done on February 19, 1999, and stated that Frigo required the amputation because of a mid-foot bone infection (osteomyelitis). Dr. Eilers testified that Frigo initially had a good blood flow and good profusion in the leg and that she did not have diabetic vascular disease or nerve disease. Dr. Eilers testified that a nurse cannot work in an intensive care unit if she cannot bear weight and walk. Dr. Eilers testified that Frigo would have difficulty returning to work as a critical care floor nurse.

### Dr. Brent Smith

Dr. Brent Smith, Frigo's general physician, testified that he examined the ulcers and confirmed that she had osteomyelitis. He also testified that she would not be able to return to work as a critical care nurse.

### Dr. Irving Rudman

Dr. Irving Rudman, Silver Cross's former vice-president of medical affairs, testified that a 12-month surgical residency contains more surgery than does a 12-month primary care podiatric residency. There would be more education and study involving conditions that lead to surgery of the foot. Category II privileges involve surgery to the foot, including internal fixation. Dr. Rudman knew in 1995 that Dr. Kirchner was not board certified and had not completed either a 12-month

surgical residency or the written board-eligibility exam. Dr. Rudman testified that he had no reason to doubt the statement by another podiatrist that 250 surgical opportunities would be available to a resident enrolled in a surgical residency program. He also stated that he saw nothing in the bylaws that applied to grandfather exemptions for podiatrists who did not meet the written prerequisites.

Silver Cross's Case

Dr. Benjamin Lipsky

Dr. Benjamin Lipsky, Silver Cross's internal medicine and infectious diseases expert, testified that Frigo suffered a fracture and developed cellulitis, which was treated successfully with antibiotics. He opined that her condition was compatible with Charcot osteoarthropathy,[2] with a foot infection as her secondary problem that was dealt with by antibiotics. The bones lose mineralization and fracture. Charcot osteoarthropathy occurs in patients with severe neuropathy where they cannot feel pain or pressure and occurs in the absence of any break in the skin. Dr. Lipsky testified that he believes her condition was not very compatible with osteomyelitis. Most patients who get osteomyelitis get it from an ulceration. He agreed she had an infection and that her diagnosis in February was osteomyelitis.

Dr. David Armstrong

Dr. David Armstrong, an expert who was board certified in podiatry, opined that Frigo was

---

[2] Dr. Lipsky explained that Charcot osteoarthropathy is "a process where the bones lose mineralization, the joints lose their inherent structure, bones fracture, joints sublux or dislocate and eventually the normal architecture of the foot is lost."

an appropriate candidate for a bunionectomy. He testified that he believed she had neuropathy, because a diabetic with ulcers has neuropathy in almost every case. He thought her ulcer was healed, but said surgery was appropriate even if it was not healed because she had a high risk of developing another wound due to the bunion deformity. Her ulcer had healed by the time of the surgery. Dr. Armstrong testified that Frigo did not have an infected ulcer. Dr. Armstrong testified that Dr. Kirchner's diagnosis was osteomyelitis when he removed the screw, and he did not mention Charcot disease. Dr. Armstrong opined that Dr. Kirchner's follow-up care met the standard of care and that treating the cellulitis with antibiotics was appropriate. The rapid disorganization of the bone in her foot was characteristic of Charcot disease and not osteomyelitis. Dr. Armstrong testified that different antibiotics would not have made a difference. Dr. Armstrong also stated that the delay in removing the screw did not violate the standard of care. Dr. Armstrong testified that Charcot disease caused the amputation.

## Dr. Joseph Lentino

Dr. Joseph Lentino, a specialist in infectious disease, testified that the Trovan given by Dr. Kirchner was effective against MRSA, that the patient had Charcot disease, and that she had an earlier episode of osteomyelitis. Dr. Lentino testified that the drug of choice for MRSA was Vancomycin, and he believed that Frigo did have osteomyelitis.

## Dr. David Benfer

Dr. David Benfer, defendant's healthcare administration expert, described some of the documents typically submitted when applying for credentials and the process. He testified that the JCAHO's guidelines prevent hospitals from varying the credentialing procedure to any extent. Dr.

Benfer testified that there is an expectation that institutions will meet the JCAHO's standards. Privileges must be granted consistent with the bylaws. The chief executive officer is responsible for seeing that credentialing is done in accordance with the bylaws. Silver Cross's chief executive officer delegated that duty, but it remained his responsibility. Dr. Benfer stated that Pawlak, Silver Cross's chief executive officer, said he was not aware that a podiatrist had to have a 12-month surgical residency and complete the written eligibility exam for board certification. It is clear that the chief executive officer did not know what the bylaws required for podiatrists. Pawlak said that he did not investigate whether credentials were being granted in accordance with Silver Cross's bylaws. Neither the chief executive officer nor the hospital's staff investigated Dr. Kirchner's credentials. In addition, Dr. Benfer reviewed the 1992 privilege application card. When category II privileges are requested, the applicant must submit evidence of additional postgraduate surgical training. Dr. Benfer opined that does not require a 12-month surgical training. The application gives a series of examples of such training, but does not specifically state that applicants must complete a certain 12-month experience. The applicant simply had to show such training. Dr. Benfer testified that he believed that Dr. Kirchner complied with the prerequisites for the 1992 category II surgical credentials.

Dr. Benfer testified that Dr. Kirchner had completed a primary care residency. Dr. Benfer also testified that the credentialing requirements in effect at that time included examples of postgraduate training using the words "completion of an approved surgical residency," rather than just any experience with surgery. After 1993, the requirements for category II privileges could not have been clearer. He did not know if Kirchner met the 12-month surgical residency requirement imposed at that time or 1998.

Next, Dr. Benfer testified that recredentialing occurs every two years, pursuant to the JCAHO's standards. That assures the general public and the institution that there is ongoing monitoring. Benfer opined that there is no need for the doctor to go back and meet formal education requirements like additional residencies. He also opined that the new 12-month surgical residency would not be imposed on someone like Dr. Kirchner, who had already been credentialed. Dr. Benfer testified that it is very common to grandfather individuals so they do not have to return for a training program. He said it would be unfair to require a doctor to go back to school for two or three years, so grandfathering became common. Dr. Benfer stated that he did not find a grandfathering provision in the bylaws.

### The Jury Verdict and Posttrial Motions

After the presentation of evidence, the jury was instructed that plaintiff claimed Silver Cross "failed to exercise ordinary care in granting Category 2 surgical privileges to Paul Kirchner, D.P.M., which resulted in Dr. Kirchner's negligent treatment of the plaintiff. The plaintiff further claims that the foregoing was a proximate cause of her injuries." The jury was also instructed that if it decided Silver Cross was guilty of that conduct, then it was to "consider whether podiatrist Paul Kirchner was professionally negligent." On August 26, 2004, the jury returned a verdict for Frigo and awarded her $7,775,668.02 in damages.

On November 24, 2004, Silver Cross filed a posttrial motion arguing that: (1) Frigo's action was barred by the statute of limitation because the negligent credentialing claim raised in the first amended complaint did not relate back to the allegation in the original complaint; (2) Frigo's negligent credentialing claim was barred by the Medical Studies Act; (3) Frigo's negligent credentialing claim

was barred by the Hospital Licensing Act; (4) Frigo failed to prove that Silver Cross was negligent in granting Dr. Kirchner category II surgical privileges; and (5) the trial court denied Silver Cross a fair trial when it instructed the jury with IPI Civil (2006) No. 30.23. The motion was denied. The trial court credited Silver Cross with the $900,000 paid in the settlement by Dr. Kirchner before trial, resulting in a net judgment of $6,875,668.02.

ANALYSIS

We begin our analysis with Silver Cross's argument that the trial court erred when it denied the hospital's motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict is to be entered only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could stand based on the evidence. McClure v. Owens Corning Fiberglas Corp., 188 Ill. 2d 102, 132 (1999). In deciding whether to grant such a judgment, the trial court may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable. McClure, 188 Ill. 2d at 132, quoting Maple v. Gustafson, 151 Ill. 2d 445, 453 (1992). Likewise, a reviewing court may not usurp the role of the jury and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position. McClure, 188 Ill. 2d at 132. Therefore, appellate courts apply a *de novo* standard of review when reviewing decisions on motions for judgments notwithstanding the verdict. McClure, 188 Ill. 2d at 132, quoting Maple, 151 Ill. 2d at 453.

I. Statute of Limitations

First, Silver Cross argues that the trial court erred in denying its motion for a judgment notwithstanding the verdict because Frigo's negligent credentialing claim is barred by the two-year statute of limitations and the four-year statute of repose. Specifically, Silver Cross contends that although Frigo's original complaint was timely filed, the allegations of negligent credentialing were not made until Frigo filed her amended complaint, which was more than two years after her cause of action accrued and more than four years after her last visit to Dr. Kirchner. Silver Cross argues that the allegations of negligent credentialing did not relate back to Frigo's original, timely filed complaint, which only alleged that Dr. Kirchner was negligent in providing surgical and postsurgical care. Frigo concedes that the first amended complaint was filed after the running of the two-year statute of limitations, but argues that the trial court correctly determined that the allegations in the first amended complaint related back to the allegations in Frigo's original complaint that were timely filed.

"The application of statutes of limitations is a question of law that is evaluated according to a *de novo* standard of review." First Baptist Church of Lombard v. Toll Highway Authority, 301 Ill. App. 3d 533, 540 (1998), citing Tatara v. Peterson Diving Service, 283 Ill. App. 3d 1031, 1037 (1996). The statute of limitations for a medical malpractice action is found in section 13-212(a) of the Code of Civil Procedure (Code), which provides:

> "[N]o action for damages for injury or death against any
> physician *** arising out of patient care shall be brought more than 2
> years after the date on which the claimant knew, or through the use of
> reasonable diligence should have known, or received notice in writing
> of the existence of the injury or death for which damages are sought

in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." 735 ILCS 5/13-212(a) (West 2000).

Frigo acknowledges that her first amended complaint was filed after the expiration of the statute of limitations. However, Frigo contends that the negligent credentialing allegations in the first amended complaint are not time-barred because the allegations "relate back" to the original complaint, which named Silver Cross as a party defendant. Section 2-616(b), which governs amendments to pleadings filed after the statute of limitations period has expired, provides:

"(b) The cause of action *** set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted *** in the amended pleading grew out of the same transaction or occurrence set up in the original pleading ***." 735 ILCS 5/2-616(b) (West 2000).

Section 2-616(b) makes it clear that any cause of action set up in an amended pleading shall not be time-barred and shall be said to relate back to the date of the filing of the original pleading so long

as (1) the original pleading was timely filed, and (2) it appears from the original and amended pleadings that the cause of action asserted grew out of the same transaction or occurrence set up in the original pleading. 735 ILCS 5/2-616(b) (West 2000); see also Grove v. Carle Foundation Hospital, 364 Ill. App. 3d 412, 418 (2006).

In Zeh v. Wheeler, 111 Ill. 2d 266, 278 (1986), our supreme court noted a trend and held that Illinois courts are liberal in allowing amendments to pleadings that relate back after the statute of limitations has expired. We note that "[t]he purpose of section 2-616(b) is to insure fairness to litigants rather than to unduly enhance the technical considerations of common law pleadings." Castro v. Bellucci, 338 Ill. App. 3d 386, 390-91 (2003), citing Sompolski v. Miller, 239 Ill. App. 3d 1087, 1090 (1992). To further this purpose, appellate courts have liberally construed the requirements of section 2-616(b) in favor of hearing a plaintiff's claim. Bellucci, 338 Ill. App. 3d at 391, citing Sompolski, 239 Ill. App. 3d at 1090. " 'Medical malpractice plaintiffs, in particular, are afforded every reasonable opportunity to establish a case, and to this end, amendments to pleadings are liberally allowed to enable the action to be heard on the merits rather than brought to an end because of procedural technicalities.' " Bellucci, 338 Ill. App. 3d at 391, quoting Avakian v. Chulengarian, 328 Ill. App. 3d 147, 154 (2002).

"Central to this inquiry is whether the record reveals that the defendant was on notice, before the expiration of the [limitations] period, of the facts upon which the claim set out in the amended complaint is based." Bellucci, 338 Ill. App. 3d at 391, citing Cammon v. West Suburban Hospital Medical Center, 301 Ill. App. 3d 939, 946 (1998), and Wolf v. Meister-Neiberg, Inc., 143 Ill. 2d 44, 46-48 (1991). "In determining whether the subsequent pleading relates back to the filing of the initial

pleading, the focus is not on the nature of the causes of action, but on the identity of the transaction or occurrence." Bellucci, 338 Ill. App. 3d at 391, citing Zeh, 111 Ill. 2d at 272-73. "However, the cause of action asserted in the later complaint need not be identical to or substantially the same as the claim raised in the original pleading." Bellucci, 338 Ill. App. 3d at 391, citing Weber v. Cueto, 253 Ill. App. 3d 509, 516 (1993). Relation back will be allowed where the defendant received adequate notice of the occurrence or transaction that is the basis of the plaintiff's claim. Zeh, 111 Ill. 2d at 279. The rationale for this rule is that a defendant will not be prejudiced so long as his attention has been directed, within the limitations period, to the facts that form the basis of the claim asserted against him. Zeh, 111 Ill. 2d at 273.

We find McArthur v. St. Mary's Hospital of Decatur, 307 Ill. App. 3d 329 (1999), and Marek v. O.B. Gyne Specialists, II, S.C., 319 Ill. App. 3d 690 (2001), instructive. In McArthur, the plaintiff sued a hospital and several doctors for the death of a baby due to complications during the delivery. In the original complaint, the only allegation made against the hospital was that it " '[f]ailed to implement and/or enforce a policy requiring a permanent radiographic image of all ultrasound sonogram examinations be maintained.' " McArthur, 307 Ill. App. 3d at 331. The allegations against other defendants included the failure to correctly read the sonograms and X-rays taken and the failure to diagnose the deceased infant's hydrocephalus. First and second amended complaints were subsequently filed with the same sole allegation against the hospital. McArthur, 307 Ill. App. 3d at 331-32. Discovery proceeded and during the deposition of one of the defendant's radiologists, it was discovered that the radiologist never evaluated the X-rays at issue because one of the hospital's technicians had that responsibility. McArthur, 307 Ill. App. 3d at 332. Though outside the

limitations period, the plaintiffs moved for leave to file a third amended complaint in which seven new allegations were added against the hospital, relating to the negligent interpretation of the sonogram and X-rays by one of the hospital's agents on a date different from the date specified in earlier complaints. The trial court granted the motion.

The hospital filed a motion and was granted summary judgment, arguing that the new allegations set forth different conduct by different people than in the original pleadings and were therefore time-barred. McArthur, 307 Ill. App. 3d at 333. The appellate court reversed finding from the beginning of the litigation that the hospital was aware that the plaintiffs were asserting negligence in connection with the reading of the sonograms and X-rays and that these claims had already been asserted against certain agents of the hospital. The court found neither prejudice nor unfair surprise to the hospital in allowing the amended claims to relate back because the hospital knew of the involvement of its own personnel who were reading the films from the suit's inception. McArthur, 307 Ill. App. 3d at 336.

Additionally, in Marek, the plaintiff appealed the trial court's dismissal of her second amended complaint against the defendant entity, O.B. Gyne, based upon the running of the statute of limitations. The original complaint named O.B. Gyne and several other defendants and alleged that those medical care providers failed to properly diagnose, advise and treat her for breast cancer. Marek, 319 Ill. App. 3d at 692. In count III of her original complaint, the plaintiff sued Dr. Lupo for negligence and sued O.B. Gyne, Dr. Lupo's employer, as a principal. In count I of her second amended complaint, filed well after the statute of limitations had run, the plaintiff alleged that her gynecologist, Dr. McGill, was an agent of O.B. Gyne because upon his retirement all of his records

became the property of O.B. Gyne and, therefore, O.B. Gyne was directly negligent for failing to advise Marek of the abnormalities discovered in a mammography report subsequent to Dr. McGill's retirement. Marek, 319 Ill. App. 3d at 694. In count II of her second amended complaint, Marek alleged that she was unaware of her direct cause of action against O.B. Gyne until it answered discovery, at which time she determined that O.B. Gyne possessed McGill's records, and only after this discovery did she realize that a direct cause of action existed against O.B. Gyne. Marek, 319 Ill. App. 3d at 694. Further, in count III of the second amended complaint Marek alleged that Dr. Lupo was negligent for failing to refer her for further diagnostic testing.

The appellate court reversed the trial court's dismissal of the entire case and remanded the case to the trial court, holding that O.B. Gyne's attention was directed to the allegations of negligence made against its agents at the time the original complaint was filed, despite the fact the allegations made against it directly in earlier complaints were based upon the conduct of a different agent. The court reasoned that because O.B. Gyne had been made aware of the occurrence that formed the basis of the claim (the failure to properly diagnose and treat the plaintiff's cancer), it was able to adequately prepare to meet the plaintiff's claims regardless of the theory under which they were brought. Marek, 319 Ill. App. 3d at 698-99.

We believe that the reasoning employed in McArthur and Marek should be followed in the instant case. First, like McArthur and Marek, we find that Frigo's original complaint was timely filed as required by section 13-212(a) of the Code. Therefore, Frigo's original complaint has satisfied the timely filing requirement of section 2-616(b). See 735 ILCS 5/2-616(b) (West 2000); Grove, 364 Ill. App. 3d at 418.

-24-

Next, we must review the allegations set forth in Frigo's original complaint, which was filed on October 6, 2000, to determine whether the cause of action for negligent credentialing in the first amended complaint grew out of an occurrence or transaction set forth in the original complaint. See 735 ILCS 5/2-616(b) (West 2000); Grove, 364 Ill. App. 3d at 418. In her original complaint, Frigo alleged that Silver Cross, by and through its duly authorized agents, including Dr. Kirchner, owed her a duty to possess and apply the knowledge and use the skill and care that physicians specializing in the practice of podiatrics would use in similar cases and circumstances. Frigo argued that Silver Cross, through Dr. Kirchner, was negligent in failing to adequately observe, monitor, and treat her left foot following her surgery on October 8, 1998. We note that, like McArthur and Marek, Frigo's original complaint specifically named Silver Cross as a defendant. Paragraph 11 of the original complaint alleged that Silver Cross:

> "(A) Carelessly and negligently managed, maintained,
> controlled, owned and operated said medical centers in such manner
> causing the Plaintiff to be injured."

We also note that, similar to McArthur and Marek, the original complaint in this case specifically included negligence allegations against Silver Cross.

Next, we must review Frigo's first amended complaint, which was filed on April 25, 2003, approximately 2½ years after the filing of the original complaint. Specifically, paragraph 12 of the first amended complaint alleged that Silver Cross breached its duty of reasonable care in the management, control and operation of its medical center in one or more of the following respects:

> "(A) Failed to properly review, monitor and supervise the

medical care and treatment administered to plaintiff by its medical staff, agents, physicians and nurses, including but not limited to Dr. Paul Kirchner in violation of its own hospital regulations/Bylaws and applicable JCAHO Standards.

(B) Failed to exercise reasonable skill and care in the selection, retention, credentialing, and continuing evaluation of the medical staff, agents, physicians and nurses who provided treatment to plaintiff, including but not limited to Dr. Paul Kirchner in violation of its own regulation/Bylaws and applicable JCAHO Standards.

(C) Failed to adequately assess the competence of the medical staff, agents, physicians and nurses who provided treatment to plaintiff, including but not limited to Dr. Paul Kirchner in violation of its own hospital regulations/Bylaws and applicable JCAHO Standards.

(D) Failed to adequately determine the qualifications of the medical staff, agents, physicians and nurses who provided treatment to plaintiff, including but not limited to Dr. Paul Kirchner in violation of its own hospital regulations/Bylaws and applicable JCAHO Standards.

(E) Negligently allowed and permitted unqualified medical staff/physicians, including Dr. Kirchner to surgically treat the Plaintiff on 10/8/98 in violation of its own hospital regulations/Bylaws and

applicable JCAHO Standards."

Comparing the management allegations made against Silver Cross in Frigo's original complaint to the more specific management and negligent credentialing allegations in the first amended complaint, we find that the management allegations in the original complaint and the more specific management and negligent credentialing allegations in the first amended complaint arose from the same transaction or occurrence, namely, Frigo's treatment during and after her October 8, 1998, foot surgery. See 735 ILCS 5/2-616(b) (West 2000)). We note that all parties agree that Frigo's first amended complaint was filed outside the limitations period prescribed in section 13-212(a) of the Code. However, we find, following the liberal construction rules in Bellucci and Avakian, that the management allegations in Frigo's original complaint provided Silver Cross with adequate notice of the more specific negligent credentialing allegations in the first amended complaint. Bellucci, 338 Ill. App. 3d at 391, quoting Avakian v. Chulengarian, 328 Ill. App. 3d 147, 154 (2002); see also Zeh, 111 Ill. 2d at 278. Our review of the complaints indicates that paragraph 11(A) of the original complaint is repeated and expounded upon in paragraph 12 of Frigo's first amended complaint, which alleges that Silver Cross breached its duty of care in the management, control and operation of the hospital by failing to exercise reasonable skill and care in the selection, retention and credentialing of its physicians, including Dr. Kirchner. Although the first amended complaint contains more detailed allegations of negligence against Silver Cross, we find that Silver Cross had adequate notice in the original complaint because Frigo alleged that Silver Cross negligently managed the hospital. See Jones v. Chicago HMO Ltd. of Illinois, 191 Ill. 2d 278, 291 (2000) (hospitals may be found liable for institutional negligence and for breaching an independent duty, which is administrative and managerial

in character, to care for their patients). We find that Silver Cross was responsible for managing the hospital, had firsthand knowledge of its credentialing requirements, and knew whether Dr. Kirchner met those requirements. Therefore, we find that Silver Cross was supplied with the essential information it needed to prepare a defense to the management claim in the original complaint because similar but more specific and detailed allegations were later alleged in the first amended complaint with respect to the hospital's management---- selection, retention, and credentialing of its physicians.

We hold that Silver Cross was adequately apprised, before the expiration of the limitations periods (the two-year statute of limitations and four-year statute of repose), of the transaction or occurrence upon which Frigo's claims in the first amended complaint were based. Accordingly, the trial court did not err when it denied Silver Cross's motion for a judgment notwithstanding the verdict predicated on the expiration of the statute of limitations.

## II. Medical Studies Act

Next, Silver Cross argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because the Medical Studies Act (Act) barred the introduction of evidence about what its credentials committee reviewed and therefore Silver Cross was prevented from defending itself. Silver Cross contends that the information it sought to defend itself with is privileged under sections 8-2101 and 8-2102 of the Act. 735 ILCS 5/8-2101, 8-2102 (West 2000). Frigo argues that the Act protects statements and information collected on a physician by a hospital's peer-review committee. Frigo contends that she did not rely on any information that comes within the purview of the Act.

The question of whether the Act's privilege applies is a question of law that is reviewed *de*

1-05-1240

*novo*; however, the question of whether specific information, records, reports, statements, notes, memoranda or data are part of an internal quality control "is a factual question," on which defendants bear the burden. Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc., 347 Ill. App. 3d 817, 825 (2004), citing Berry v. West Suburban Hospital Medical Center, 338 Ill. App. 3d 49, 53-54 (2003).

Section 8-2101 of the Act provides, in pertinent part, as follows:

"All information * * * used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services, except that in any health maintenance organization proceeding to decide upon a physician's services or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based." 735 ILCS 5/8-2101 (West 2000).

The Act further provides:

"Such information, records, reports, statements, notes,

-29-

memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility." 735 ILCS 5/8-2102 (West 2000).

"The purpose of the [Act] is to ensure that members of the medical profession can maintain effective professional self-evaluation and to improve the quality of healthcare." Giangiulio v. Ingalls Memorial Hospital., 365 Ill. App. 3d 823, 835 (2006), citing Pietro v. Marriott Senior Living Services, Inc., 348 Ill. App. 3d 541, 548 (2004). "The Act also serves 'to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease.' " Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc., 347 Ill. App. 3d 817, 824-25 (2004), quoting Niven v. Siqueira, 109 Ill. 2d 357, 366 (1985). "The belief underlying the [Act] is that, without a statutorily mandated peer-review privilege, it is unlikely that physicians would evaluate their colleagues." Giangiulio, 365 Ill. App. 3d at 835, citing Pietro, 348 Ill. App. 3d at 548.

"However, *** not every piece of information a hospital staff acquires is nondiscoverable, even if it is acquired by a peer-review committee." Giangiulio, 365 Ill. App. 3d at 835, citing Stricklin v. Becan, 293 Ill. App. 3d 886, 890 (1997). The Act "protects against disclosure of the mechanisms of the peer-review process, including information gathering and deliberations leading to the ultimate decision rendered by a peer-review committee, but does not protect against the discovery of

information generated before the peer-review process begins or information generated after the peer-review process ends." Giangiulio, 365 Ill. App. 3d at 835, citing Pietro, 348 Ill. App. 3d at 549. "The Act 'was never intended to shield hospitals from potential liability' and 'legal advice is not a goal of the protection offered by the Act.' " Webb, 347 Ill. App. 3d at 825, quoting Roach v. Springfield Clinic, 157 Ill. 2d 29, 40 (1993). "The Act does not protect 'all information used for internal quality control' [citation]; instead, documents 'generated specifically for the use of a peer-review committee receive protection under the Act' [citation]. A document that 'was initiated, created, prepared, or generated by a peer-review committee' is privileged under the Act, 'even though it was later disseminated outside the peer-review process.' [Citation.] [However, a] document created 'in the ordinary course of the hospital's medical business or for the purpose of rendering legal opinions or to weigh potential liability risk or for later corrective action by the hospital staff' is not privileged 'even though it later was used by a committee in the peer-review process.' " Webb, 347 Ill. App. 3d at 825, citing Chicago Trust Co., 298 Ill. App. 3d at 402,406.

In this case, Frigo's first amended complaint alleged that Silver Cross deviated from its regulations and bylaws and the JCAHO standards when it gave Dr. Kirchner category II surgical credentials. First, we note that the allegations in Frigo's complaint focused on the hospital's credentialing requirements codified in the regulations, bylaws and JCAHO standards and whether Dr. Kirchner met those requirements and did not focus on the credentialing committee's discussions or the process it followed when it granted Dr. Kirchner his credentials. See Giangiulio, 365 Ill. App. 3d at 835, citing Pietro, 348 Ill. App. 3d at 549. Next, we note that Silver Cross's regulations and bylaws and the JCAHO standards were generated in the ordinary course of business and are not

records, reports, statements, notes, memoranda or data that were generated by or for the specific use of the hospital's peer-review committee. Webb, 347 Ill. App. 3d at 825. "The Act was 'never intended to shield hospitals from potential liability.' " Webb, 347 Ill. App. 3d at 825, quoting Roach, 157 Ill. 2d at 42. We believe that if this court made such an expansive reading of the Act, it would eliminate actions against hospitals for institutional negligence. See Giangiulio, 365 Ill. App. 3d at 835; Webb, 347 Ill. App. 3d at 825 ("[t]he Act does not protect 'all information used for internal quality control' [citation]; instead, documents 'generated specifically for the use of a peer-review committee receive protection under the Act.' [citation]"). Accordingly, following Giangiulio and Webb, we hold that Silver Cross's regulations and bylaws and the JCAHO standards are not within the purview of the Act privilege; therefore, the trial court did not err when it denied Silver Cross's motion for a judgment notwithstanding the verdict. See Giangiulio, 365 Ill. App. 3d at 835, citing Pietro, 348 Ill. App. 3d at 549; Webb, 347 Ill. App. 3d at 825.

### III. Hospital Licensing Act

Next, Silver Cross argues that the trial court erred when it denied its motion for judgment not withstanding the verdict because the Hospital Licensing Act (Licensing Act) immunized Silver Cross against any claim based upon its credentialing decisions. Frigo, however, argues that the Licensing Act is inapplicable to this case because it has only been applied in cases where a physician applicant has been denied hospital privileges and the physician is challenging the findings of the hospital.

Section 10.2 of the Licensing Act provides:

> "[N]o hospital *** shall be liable for civil damages as a result of the
> acts, omissions, decisions, or any other conduct, except those

> involving wilful or wanton misconduct, of \*\*\* any \*\*\* committee or
> individual whose purpose, directly or indirectly, is internal quality
> control \*\*\*, or for the purpose of professional discipline \*\*\*. \*\*\* For
> the purposes of this [s]ection, 'wilful and wanton misconduct' means
> a course of action that shows actual or deliberate intention to harm or
> that, if not intentional, shows an utter indifference to or conscious
> disregard for a person's own safety and the safety of others." 210
> ILCS 85/10.2 (West 2000).

"The legislative objective of section 10.2 is ' "to foster effective self-policing by members of the medical profession in matters unique to that profession and to thereby promote a legitimate State interest in improving the quality of health care in Illinois." ' " Szczerbaniuk v. Memorial Hospital for McHenry County, 180 Ill. App. 3d 706, 711 (1989), quoting Knapp v. Palos Community Hospital, 176 Ill. App. 3d 1012, 1024 (1988), quoting Rodriguez-Erdman v. Ravenswood Hospital Medical Center, 163 Ill. App. 3d 464, 470 (1987). "The stated purpose of section 10.2 is 'to encourage peer-review by health care providers.' " Szczerbaniuk, 180 Ill. App. 3d at 711, quoting Ill. Rev. Stat. 1987, ch. 111 ½ , par. 151.2.

Furthermore, the Licensing Act is intended to:

> "provide for the better protection of the public health through the
> development, establishment, and enforcement of standards (1) for the
> care of individuals in hospitals, (2) for the construction, maintenance,
> and operation of hospitals which, in light of advancing knowledge,

will promote safe and adequate treatment of such individuals in hospital, and (3) that will have regard to the necessity of determining that a person establishing a hospital have the qualifications, background, character and financial resources to adequately provide a proper standard of hospital service for the community." 210 ILCS 85/2(a) (West 2000).

Our review of the Licensing Act and its purpose reveals that it seeks to regulate internal hospital controls. We note that the Licensing Act has routinely been at issue in cases where physicians have filed lawsuits against hospitals. See Cardwell v. Rockford Memorial Hospital, 136 Ill. 2d 271 (1990) (hospital physician, who resigned following a peer-review committee's evaluation of his suspected alcohol, drug, emotional or mental problem, brought action against hospital association and assistant hospital administrator for slander, coercion, intentional infliction of emotional distress, and intentional interference with employment contract); Lo v. Provena Covenant Medical Center, 356 Ill. App. 3d 538 (2005) (physician sued hospital for breach of contract, alleging hospital violated medical-staff bylaws by restricting his clinical privileges without granting him a hearing); Tabora v. Gottlieb Memorial Hospital, 279 Ill. App. 3d 108 (1996) (physician whose staff privileges had been revoked brought suit against hospital and its director); Rockford Memorial Hospital v. Department of Human Rights, 272 Ill. App. 3d 751 (1995) (hospital brought action against the Department of Human Rights seeking an injunction and declaration that Department lacked jurisdiction to investigate discrimination charge made by physician whose hospital staff privileges were restricted by peer-review committee); Szczerbaniuk v. Memorial Hospital for

McHenry County, 180 Ill. App. 3d 706 (1989) (physician sued hospital over termination of his agreement to provide radiology services).

We find that section 10.2 of the Licensing Act is a limitation on the remedies available to physicians aggrieved by a hospital's peer-review process. Rockford Memorial Hospital, 272 Ill. App. 3d at 761, citing Levy v. McKiel, 185 Ill. App. 3d 240, 243 (1989). In addition, we note that the Licensing Act immunizes "acts, omissions, decisions or any other conduct" of a "credential committee" whose purpose is "internal quality control" or " medical study" to reduce morbidity or mortality or improving or benefitting patient care within a hospital or for the purpose of professional discipline. 210 ILCS 85/10.2 (West 2000). However, we also note that the Licensing Act does not relieve any individual or hospital from liability arising from treatment of a patient. 210 ILCS 85/10.2 (West 2000). In light of the fact this case involves negligent medical treatment provided to a hospital patient, we hold that the immunity provision in the Licensing Act does not apply. 210 ILCS 85/10.2 (West 2000). Accordingly, we hold that the trial court did not err when it denied Silver Cross's motion for judgment not withstanding the verdict on this issue.

## IV. Negligent Credentialing

Next, Silver Cross argues that the trial court erred in denying its motion notwithstanding the verdict because Frigo failed to prove that it was negligent in granting Dr. Kirchner category II surgical privileges before he operated on Frigo's left foot on October 8, 1998. Silver Cross specifically argues that (1) Frigo did not prove that its bylaws were violated; (2) the medical staff's amendment of the podiatric surgical privilege requirements did not equate with the standard of care that applied to Silver Cross; and (3) Frigo's expert witnesses proffered speculative opinions, facts

unsupported by the record, and evidence lacking any probative value of negligence. Silver Cross argues that although Dr. Kirchner was recredentialed on May 27, 1998, before that time he had been initially appointed to the medical staff in 1992, monitored for 11 months, granted temporary surgical privileges, and recredentialed with category II surgical privileges twice before. Silver Cross argues that during the six years that Dr. Kirchner was on the hospital's staff, he performed hundreds of surgeries and there was no evidence of any incident, problem, complaint, or adverse outcome that should have caused Silver Cross's credentials committee to deny his 1998 recredentialing application. Frigo argues that the overwhelming weight of the evidence demonstrated that Silver Cross erred in its initial grant of category II surgical privileges to Dr. Kirchner because he did not meet the prerequisites for those privileges in 1992.

In Darling, the Illinois Supreme Court recognized that hospitals may be held liable for institutional negligence and acknowledged that hospitals have an independent duty to assume responsibility for the care of their patients. Darling, 33 Ill. 2d at 331. Ordinarily, this duty is administrative or managerial in character. Jones v. Chicago HMO Ltd. of Illinois, 191 Ill. 2d 278, 291 (2000); Advincula v. United Blood Services, 176 Ill. 2d 1, 28 (1996); also see Johnson v. St. Bernard Hospital, 79 Ill. App. 3d 709, 718 (1979) ("It requires not medical expertise, but administrative expertise, to enforce rules and regulations" adopted to ensure smoothly run hospital and adequate patient care). To fulfill this duty, a hospital must act as would a " 'reasonably careful hospital' " under the circumstances. Jones, 191 Ill. 2d at 291-92, quoting Advincula, 176 Ill. 2d at 29. "Liability is predicated on the hospital's own negligence, not the negligence of the physician." Jones, 191 Ill. 2d at 292. "[I]n recognizing a hospital's institutional negligence as a cause of action,

Darling *** applied principles of common law negligence to hospitals in a manner that comports with the true scope of their operations." Jones, 191 Ill. 2d at 292, citing Darling, 33 Ill. 2d at 331 (noting that a hospital's duty in negligence cases is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk).

To prove negligence, the plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately caused by the breach. Jones, 191 Ill. 2d at 294, citing Cunis v. Brennan, 56 Ill. 2d 372, 374 (1974). "The standard of care, also known as the standard of conduct, falls within the duty element." Jones, 191 Ill. 2d at 294. In an action for institutional negligence against a hospital, the standard of care applicable to a hospital may be proved from a number of evidentiary sources and expert testimony is not always required. Jones, 191 Ill. 2d at 294-96; Advincula, 176 Ill. 2d at 29-34; Darling, 33 Ill. 2d at 330-33.

Silver Cross does not question whether negligent credentialing constitutes a cause of action under the theory of liability of hospital institutional negligence. However, neither party has cited to this court case precedent which directly addresses negligent credentialing. This court's research has revealed extensive authority from other state and federal courts addressing the issue. While decisions from foreign jurisdictions are not binding on Illinois courts, where they are relevant in construing language and addressing issues that Illinois courts have not, they may be examined. VanPlew v. Riccio, 317 Ill. App. 3d 179, 184 (2000); Skipper Marine Electronics, Inc. v. United Parcel Service, Inc., 210 Ill. App. 3d 231, 239 (1991).

The annotation, *Tort Claims for Negligent Credentialing of Physician*, 533 A.L.R. 5th 433 (2002), contains a wealth of authority on the issue. In Insinga v. LaBella, 543 So. 2d 209 (Fla.

1989), the Florida Supreme Court cited our supreme court's holding in Darling and held:

"[W]e find, as a matter of public policy, that hospitals are in the best position to protect their patients and, consequently, have an independent duty to select and retain competent independent physicians seeking staff privileges. We note that the hospital's liability extends only to the physician's conduct while rendering treatment to patients in the hospital and does not extend to his conduct beyond the hospital premises. [Citation.]  Moreover, the hospital will only be responsible for the negligence of an independent physician when it has failed to exercise due care in the selection and retention of that physician on its staff." Insinga v. Labella, 543 So. 2d at 214.

The Florida Supreme Court recently followed Insinga in Horowitz v.Plantation General Hospital Limited Partnership, No. SC05 - 331 (May 24, 2007).

Similarly, in Gafner v. Down East Community Hospital, 735 A.2d 969, 977 (Me. 1999), the Maine Supreme Court cited Darling as being the source for many courts adopting "corporate liability" as a cause of action against hospitals and other medical facilities.  The Gafner court pointed out that "most courts that have recognized the cause of action referred to as corporate liability have grounded the claim upon the responsibility of the facility to assure that physicians practicing in the facility are properly credentialed and licensed."  Gafner v. Down East Community Hospital, 735 A.2d at 979 (listing 11 states holding the same).  Also see St. Luke's Episcopal Hospital v. Agbor, 952 S.W.2d 503, 509-10 (Texas 1997) (listing 27 jurisdictions recognizing a hospital's direct liability, including for credentialing activities, in a dissent).

We turn now to the elements a plaintiff is required to prove to support a verdict finding a hospital liable under the theory of negligent credentialing. In Rule v. Lutheran Hospitals & Homes Society of America, 835 F.2d 1250 (8th Cir. 1987), the court held:

"The district court instructed the jury that the Rules had the burden to prove their allegations that Lutheran negligently granted Dr. Pumphrey obstetrical staff privileges to perform breech deliveries. With regard to a hospital's negligence in granting privileges, the jury was instructed that '[a] hospital must use reasonable care in determining the competence of those granted medical staff privileges.' Further, the jury was told that the Rules had the burden to prove that while practicing pursuant to negligently granted obstetrical privileges, Dr. Pumphrey committed one or more specific acts of malpractice in performing the breech delivery of Lucas Rule. Finally, the district court instructed the jury that the Rules had the burden to prove ' "[t]hat as a direct and proximate result of such negligent granting of privileges and medical malpractice" ' Lucas Rule developed cerebral palsy." Rule v. Lutheran Hospital, 835 F.2d at 1253.

In Hiroms v. Scheffey, M.D., 76 S.W. 3d 486, 489 (Tex. App. 2002), the court pointed out, "[i]f the physician is not negligent, there is no negligent credentialing claim against the hospital." As explained by the North Dakota Supreme Court in Benedict v. St. Luke's Hospitals, 365 N.W.2d 499, 505 (N.D. 1985): "If the jury found *** that the emergency room physician exercised the care and skill ordinarily possessed, exercised by, and expected of other emergency room physicians, then the

hospital's failure to exercise reasonable care in selecting the doctor to staff its emergency room could not be a proximate cause of [plaintiff's] injuries."

In Johnson v. Misericordia Community Hospital, 99 Wis. 2d 708, 301 N.W.2d 156 (1981), the Wisconsin Supreme Court considered a plaintiff's suit against a physician who was an independent contractor, not an employee of Misericordia. The plaintiff did not claim that Misericordia was vicariously liable for the doctor's negligence. In holding that "a hospital has a duty to exercise due care in the selection of its medical staff," the court relied heavily on our supreme court's holding in Darling. Johnson v. Misericordia Community Hospital, 99 Wis. 2d at 739, 301 N.W.2d at 164-65. The court further held:

> "The trial court's instruction that the hospital was required to exercise reasonable care in the granting of medical staff privileges and that reasonable care 'meant that degree of care, skill and judgment usually exercised under like or similar circumstances by the average hospital was proper.' " Johnson v. Misericordia Community Hospital, 99 Wis. 2d at 739, 301 N.W.2d at 172.

Finally, the Johnson court held that "since the procedures ordinarily employed by hospitals in evaluating applications for staff privileges are not within the realm of the ordinary experience of mankind, we agree with the ruling of the appellate court that expert testimony was required to prove the same." Johnson v. Misericordia Community Hospital, 99 Wis. 2d at 739, 301 N.W.2d at 172.

Expert testimony as to the applicable standard of care and what may constitute a violation of that standard has also been held to be required in negligent credentialing actions in Welsh v. Bulger, M.D., 698 A.2d 581, 585 (Penn. 1997), and Neff v. Johnson Memorial Hospital, 93 Conn. App. 534,

546-48, 889 A.2d 921, 928-29 (2006). We note that evidence that the hospital complied with the requirements of the JCAHO may be sufficient to support entry of summary judgment for that hospital. Coleman v. Bessmer Carraway Methodist Medical Center, 589 So. 2d 703, 706 (Ala. 1991).

To summarize, we find the above cases adequately lay out the elements needed to prove negligent credentialing. First, to prevail, the plaintiff must prove the hospital failed to meet the standard of reasonable care in the selection of the physician it granted medical staff privileges to whose treatment provided the basis for the underlying medical malpractice claim. Hospitals are required to exercise reasonable care in the granting of medical staff privileges. "Reasonable care" means that degree of care, skill and judgment usually exercised under like or similar circumstances by the average hospital. Expert testimony is required to prove the applicable standard of care and whether that standard was violated.

Second, the plaintiff must prove that, while practicing pursuant to negligently granted medical staff privileges, the physician breached the applicable standard of care. Finally, the plaintiff must prove that the negligent granting of medical staff privileges was a proximate cause of the plaintiff's injuries.

While no Illinois cases have addressed negligent credentialing as a recognized cause of action, the principles involved are not new. The Illinois Supreme Court has acknowledged that hospitals have an independent duty to assume responsibility for the care of their patients, and "this duty is administrative or managerial in character." Jones, 191 Ill. 2d at 291; Advincula, 176 Ill. 2d at 29; Darling, 33 Ill. 2d at 331. Silver Cross had a duty to act as would a " 'reasonably careful hospital' " under the circumstances. Jones, 191 Ill. 2d at 291-92, quoting Advincula, 176 Ill. 2d at 29. We note

that a hospital's "licensing regulations, accreditation standards, and hospital bylaws are admissible in a malpractice action as evidence of the standard of care by which the conduct of the hospital may be judged." Evanston Hospital v. Crane, 254 Ill. App. 3d 435, 442 (1993); Taylor v. City of Beardstown, 142 Ill. App. 3d 584, 596 (1986). At trial, both Frigo's and Silver Cross's expert witnesses testified that the duty of care is established in Silver Cross's bylaws and JCAHO's standards, which reasonably careful hospitals must comply with. On appeal, there is no dispute among the parties that Silver Cross owed Frigo a duty of care.

The parties, however, disagree as to whether Silver Cross exercised reasonable care in granting surgical privileges to Dr. Kirchner. We note that "Illinois courts recognize a duty on the part of hospitals to use reasonable care to discern the medical qualifications of persons who perform medical services in the hospital." Holton v. Resurrection Hospital, 88 Ill. App. 3d 655, 659 (1980); accord Pickle v. Curns, 106 Ill. App. 3d 734, 739 (1982) (a hospital has a duty to know the qualifications and the standard of performance of the physicians who practice on its premises). Moreover, "[i]t is a breach of the hospital's duty of care to its patients to permit a physician whom the hospital knows or should have known is unqualified, or negligent, to practice on its premises." Rohe v. Shivde, 203 Ill. App. 3d 181, 199 (1990).

We note that Silver Cross's credentialing criteria for the category II surgical privileges granted to Dr. Kirchner in 1992 required that he (1) have "additional post-graduate surgical training: e.g. [A] completion of approved surgical residency or [B] has become Board Certified by the American Board of Podiatric Surgery [ABPS], or [C] Board Eligible by the [ABPS] and *** (2) submit documentary proof of having performed the surgical procedures to the satisfaction of the Department of Surgery."

Dr. Kirchner testified that he did not have a surgical residency and that he was not board certified. It should also be noted that Frigo's expert, Dr. Kusunose, testified that he reviewed Dr. Kirchner's surgical logs from his primary care residency, and he pointed out that a primary care residency was significantly different from a surgical residency because it was focused on conservative management with very little exposure to foot surgery. Dr. Kusunose testified that Dr. Kirchner's log showed five to six category II procedures related to the foot, and none of them was a procedure done at Silver Cross in 1998. In only one of the surgeries did Dr. Kirchner participate more than 50%. Dr. Kusunose stated that Dr. Kirchner had not completed an approved surgical residency in 1992.

The 1992 category II credential requirements were amended in 1993. By the time Dr. Kirchner sought to be recredentialed in 1998, he had to meet the following requirements prescribed by the 1993 amendment in order to be conferred with category II privileges : (1) be a licensed podiatrist in Illinois; (2) to have completed a 12-month podiatric surgical residency program accepted by the ABPS and approved by the CPME of the APMA; (3) to have successfully completed the written eligibility examination; and (4) to have submitted documentation of prior performance of requested procedures, including 30 category II operative reports. Frigo argues, and Silver Cross acknowledges, that when Dr. Kirchner was recredentialed in 1998, he did not meet the amended requirements of having completed a 12-month podiatric surgical residency program.

Frigo also argues that Dr. Kirchner was not board certified and was not approved by the ABPS. Arthur Shorr, a board-certified expert in health care administration, opined that Silver Cross did not act reasonably when it initially granted category II privileges to Dr. Kirchner. Shorr testified that Silver Cross violated its own bylaws as Dr. Kirchner did not meet the minimum requirements and

that his application should not have been considered. Dr. Kirchner could not have performed surgery at Silver Cross without being credentialed.

Dr. Kusunose also testified that Dr. Kirchner did not meet the category II credentialing requirements in 1993 or in 1998. Dr. Kusunose further testified that the principle of grandfathering did not apply to Dr. Kirchner.

Silver Cross's healthcare administration expert, Dr. David Benfer, opined that Dr. Kirchner complied with the prerequisites of the 1992 rules for category II surgical credentials and was properly grandfathered in when recredentialed in 1998. However, Paul Pawlack, president of Silver Cross, and Dr. Irving Rudman, Silver Cross's vice-president, both testified that the hospital bylaws did not provide for grandfathering.

We find that the above evidence from the record demonstrates that expert testimony was used to prove the applicable standard of care. We also find that there was sufficient evidence in the record for the jury to conclude that the standard was breached by Silver Cross.

Next, we must determine whether Frigo proved that, while practicing pursuant to negligently granted surgical privileges, Dr. Kirchner breached the applicable standard of care and that this breach was a proximate cause of Frigo's injuries. Frigo presented three expert witnesses --- Dr. Mozan, Dr. Brakken, and Dr. Kusunose --- whose testimony established that Frigo's amputation was proximately caused by Dr. Kirchner's breach of the applicable standard of care. Dr. Mozan testified that Frigo was given antibiotics before surgery, which indicates that she had an infection. Dr. Mozan testified that the ulcer was present at the time of the surgery, that the infection began with the bacteria in the ulcer, and that caused the osteomyelitis. Dr. Mozan testified that if a doctor cuts through an ulcer,

the bacteria spreads and gets on the screw where it cannot be treated. Dr. Mozan opined that leaving the screw in with an infection makes it tremendously more difficult to combat the infection. Dr. Mozan testified that had Dr. Kirchner removed the screw and treated the infection earlier, Frigo's foot could have been saved. Furthermore, Dr. Mozan specifically testified that the elective surgery was the cause of Frigo's amputation. In addition, Dr. Bakken testified that the originating event for the infection was the surgery performed in the presence of the ulcer.

Dr. Kusunose opined that the elective surgery, in light of Frigo's infection, breached the standard of care. Dr. Kusunose testified that if Dr. Kirchner had not performed the October 1998 surgery, Frigo would never have had the amputation. The surgical incision here went through the infected ulcer and carried the infection into the wound. There were clear signs of infection within a week after Dr. Kirchner's surgery. The podiatrist should have cultured the wound, drained and X-rayed it, and by failing to do so violated the standard of care. Dr. Kusunose testified that given Frigo's weight, 280 pounds, Dr. Kirchner's use of a single screw in that surgery was inappropriate. Dr. Kusunose stated that when Frigo was allowed to walk, it caused the fracture and violated the standard of care. Dr. Kusunose testified that after the fracture, the screw no longer served any purpose and should have been removed, but that Dr. Kirchner could not remove the screw because he could not find it. Dr. Kusunose opined that Dr. Kirchner's inability to locate the screw was due to his lack of training and experience, and that his failure was a deviation from the standard of care. By the time the screw was removed, the bacteria had had five months to grow. Dr. Kusunose testified that Frigo should have been admitted to Silver Cross immediately for a team approach of care, with the wound opened up and antibiotics started. No team approach was ordered by Dr.

Kirchner and that also violated the standard of care. Dr. Kusunose testified that the multiple failures here went to Dr. Kirchner's lack of experience and to his lack of competence, both in doing the surgery and in not being able to recognize and treat the complications that are learned in a surgical residency.

We find that the jury was properly instructed as to the elements of negligent credentialing. During the instruction conference the trial judge said the following:

"Now, because of the innate nature of this case, the proximate cause nexus requires a second step, that number one, they've got to prove they negligently credentialed, and then number two, they've got to prove that negligent credentialing lead to Kirchner's negligence, and they've got to prove that Kirchner - - and further, that the negligent credentialing caused the injury, and that's all in here."

Later on in the instruction conference, the following colloquy took place:

"THE COURT: (To defense counsel) I said I would give your first one in a modified form. The modified - - a modified interrogatory would read as follows: Do you find that Silver Cross Hospital committed institutional negligence in credentialing or recredentialing Dr. Paul Kirchner, which proximately caused injury to Plaintiff, Jean Frigo. The modification was the addition of the language 'which proximally caused injury to Plaintiff Jean Frigo,' and I also modified it and took out 'institutional negligence' and said 'failed to exercise ordinary care.' That's being withdrawn now, that proposed

-46-

interrogatory.

MR. JARZ: That's correct."

The quoted portions of the record indicate that the jury was properly instructed as to the elements that Frigo had to prove to establish her negligent credentialing claim. The special interrogatory offered by the court and turned down by Silver Cross also supports this proposition.

The jury's verdict finding Silver Cross liable for Frigo's injuries is well supported by the evidence where Frigo's experts established that Dr. Kirchner lacked experience in podiatric surgery and did not properly treat Frigo's ulcer and infection. Frigo's amputation would have been prevented if Dr. Kirchner had not been granted category II privileges. We find that but for Silver Cross granting Dr. Kirchner category II privileges, he would not have been permitted to operate and provide inadequate postoperative care on Frigo's foot. Accordingly, we hold that the record establishes that Silver Cross's negligence proximately caused the amputation of Frigo's foot when it conferred category II surgical privileges on Dr. Kirchner without following the credentialing requirements in its regulations and bylaws.

Silver Cross contends that Frigo's experts were not credible because their testimony lacked probative value and because they were conclusory. We note that in deciding whether to grant a motion notwithstanding the verdict, the trial court may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable. McClure, 188 Ill. 2d at 132. In this case, the jury was presented with the evidence and was free to assess the credibility of witnesses and the value of their evidence. An appellate court may not usurp the role of the jury

and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position. McClure, 188 Ill. 2d at 132. We are unwilling to reweigh the evidence or substitute our judgment in this case based upon factual question tried before a jury. Accordingly, we hold that the trial court did not err when it denied Silver Cross's motion for a judgment notwithstanding the verdict.

## V.   IPI Civil (2006) No. 30.23

Finally, Silver Cross argues that the trial court erred when it instructed the jury with IPI Civil (2006) No. 30.23 because it was not applicable to this case. Frigo argues that the instruction was properly given because Silver Cross should not have allowed the initial surgery, which caused Frigo's injury, to take place. Alternatively, Frigo argues that Silver Cross was not prejudiced by the instruction.

"Whether to provide a particular jury instruction lies within the sound discretion of the trial court, and we, as the reviewing court, will not disturb that determination absent a clear abuse of discretion." Webber v. Wight & Co., 368 Ill. App. 3d 1007, 1020-21 (2006), citing Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273 (2002). "Thus, it is for the trial court to [determine] if a jury instruction is 'applicable, supported by evidence in the record, and an accurate statement of the law.' Luye v. Schopper, 348 Ill. App. 3d 767, 773 (2004) ***. It is true that litigants are entitled to have the jury instructed as to their theory of the case; however, the instructions they propose 'must accurately state applicable law' in order for them to be given at trial. [Citation.] Ultimately, there is no abuse of discretion as long as, 'taken as a whole, the instructions [given at trial] fairly, fully, and comprehensively apprise[ ] the jury of the relevant legal principles' of

the case presented. [Citation.]   A new trial will be granted based on the court's refusal to give a proposed instruction only when that refusal has caused serious prejudice to a litigant's right to a fair trial." Webber, 368 Ill. App. 3d at 1021, citing Stift v. Lizzadro, 362 Ill. App. 3d 1019, 1026 (2005), citing Linn v. Damilano, 303 Ill. App. 3d 600, 606-07 (1999).

The trial judge instructed the jury on IPI Civil (2006) No. 30.23 as follows:

> "If a defendant negligently causes an injury to the plaintiff, then the defendant is liable not only for the plaintiff's damages resulting from that injury, but is also liable for any damages sustained by the plaintiff arising from the efforts of health care providers to treat the injury caused by the defendant, even if that health care provider was negligent."

The Notes on Use provide that IPI Civil (2006) No. 30.23 is "intended to be used when there is evidence that a subsequent health care provider caused or aggravated the injury."

In this case, the evidence at trial established that the defendant, Silver Cross, managed the hospital and decided, pursuant to its regulations and bylaws, which physicians at its hospital had category II surgical privileges.  Although Dr. Kirchner did not meet the requirements prescribed in the hospital's 1992 regulations or its amendment, Silver Cross conferred category II surgical privileges on the doctor.  Frigo came to Silver Cross with an infected ulcer on her foot and Silver Cross breached a duty owed to Frigo by permitting Dr. Kirchner, who did not meet its category II surgical requirements, to perform a bunionectomy on Frigo's foot.  Dr. Kirchner aggravated Frigo's medical condition by performing a bunionectomy on her foot with the infected ulcer because the

bunionectomy caused the infection to spread, osteomyelitis developed and necessitated the amputation of Frigo's foot. In this state, a person, like Frigo, injured through another's negligence, here Silver Cross, may not only recover for the original surgery (the bunionectomy), but for any aggravation of the injury (the negligent postoperative care and the amputation) caused by the physician's (Kirchner's) malpractice. Gertz v. Campbell, 55 Ill. 2d 84, 88 (1973), citing Chicago City Ry. v. Saxby, 213 Ill. 274 (1904).

We believe that IPI Civil (2006) No. 30.23 was intended to be used in a case like this one where there are two tortfeasors. Silver Cross was negligent when it permitted Dr. Kirchner to operate on Frigo, and Dr. Kirchner's surgery caused Frigo's infection to spread resulting in Frigo developing osteomyelitis that was negligently treated and culminated in Frigo's foot being amputated. See Holden v. Rockford Memorial Hospital, 175 Ill. 2d 527 (1997); Gertz, 55 Ill. 2d at 88. We believe that IPI Civil (2006) No. 30.23 was intended to make Silver Cross liable in damages for negligently authorizing Dr. Kirchner to operate on Frigo's foot and for Dr. Kirchner's failure to provide the proper postoperative medical care which caused Frigo's foot to be amputated. Accordingly, we hold that Silver Cross was not prejudiced; therefore, the trial court did not abuse its discretion when it gave this instruction.

For the forgoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

MURPHY, J., concurs.

JUSTICE QUINN, specially concurring in part and dissenting in part:

I concur with the majority that the Hospital Licensing Act (210 ILCS 85/1 *et seq.* (West 2000)) does not immunize Silver Cross against plaintiff's claims based upon the hospital's

credentialing decisions. I also concur with the majority that the Medical Studies Act (735 ILCS 5/8-2101, 8-2102 (West 2000)) did not prevent Silver Cross from defending itself. I further concur with the majority that negligent credentialing constitutes a recognized cause of action in Illinois under the broader theory of institutional negligence. Indeed, I completely agree with the majority's analysis and holding that sufficient evidence was presented to support the jury's verdict finding Silver Cross liable for plaintiff's injuries as they were proximately caused by the negligent granting of category II surgical privileges to Dr. Kirchner. I agree with the majority as to the elements which comprise a negligent credentialing claim and I agree that the jury was properly instructed as to these elements. Finally, I concur with the majority that the jury was properly instructed when it was given IPI Civil (2006) No. 30.23. I base this concurrence upon the evidence of postoperative negligence on the part of the hospital which resulted in further injury to the plaintiff. However, I am concerned that in negligent credentialing cases which do not have evidence of postoperative direct negligence on the part of the hospital, the use of IPI Civil (2006) No. 30.23 could lead to hospitals being held liable for all of the actions of the physician to whom they negligently gave medical privileges.

In spite of my complete agreement with the majority as to the issues above, I respectfully dissent as to their holding that the negligent credentialing allegations in the first amended complaint relate back to Frigo's original complaint and were therefore timely filed.

The majority correctly point out that the two-year statute of limitations and four-year statute of repose applicable to this action against Silver Cross appear in section 13-212 of the Illinois Code of Civil Procedure, (735 ILCS 5/13-212 (West 2000)). The surgery at issue was performed on October 8, 1998, and the first complaint was filed on October 6, 2000.

Plaintiff's initial complaint alleged that Silver Cross:

1-05-1240

"(A) Carelessly and negligently managed, maintained, controlled, owned and operated said medical centers in such manner causing the plaintiff to be injured;"

Subparagraphs (B) through (E) made four specific allegations against Silver Cross for actions "following her 10/08/98 surgery."

Plaintiff filed her first amended complaint on April 25, 2003. This amended complaint alleged, among other things, that Silver Cross: "(B) Failed to exercise reasonable skill and care in the selection, retention, credentialing and continuing evaluation of the medical staff, agents, physicians and nurses who provided treatment to plaintiff, including but not limited to Dr. Paul Kirchner in violation of its own hospital regulations/by-laws and applicable JCAHO Standards."

The majority state: "we find that Silver Cross was supplied with the essential information it needed to prepare a defense to the management claim in the original complaint because similar but more specific and detailed allegations were later alleged in the first amended complaint with respect to the hospital's management - selection, retention, and credentialing of its physicians." Slip op. at 27-28.

In arriving at this conclusion, the majority provide a thoughtful analysis of several cases which address when an amended pleading that is filed after the statute of limitations has expired relates back to the prior pleading that was timely filed. In analyzing section 2-616(b) of the Code of Civil Procedure, the majority rely on several cases addressing when amended pleadings in medical malpractice actions relate back to the original pleadings, notably Castro v. Bellucci, 338 Ill. App. 3d 386 (2003), McArthur v. St. Mary's Hospital of Decatur, 307 Ill. App. 3d 329 (1999), and Marek v. O.B. Gyne Specialists II, S.C., 319 Ill. App. 3d 690 (2001), amongst others. The majority's analysis

54

is very thorough and correctly states the holdings in all of the cases they cite.

I am unwilling to concur in the majority conclusion even though it logically flows from the cases cited because I believe a separate line of cases is more closely related to our case factually.

In Grove v. Carle Foundation Hospital, 364 Ill. App. 3d 412 (2006), a case cited by the majority, the trial court denied a plaintiff's motion to amend his complaint, which originally alleged negligence against the hospital and physicians based on their treatment of the patient's infection after his second surgery. The appellate court affirmed the denial, holding that the amended allegation that the original colonoscopy procedure was negligently performed did not relate back to the original complaint because the amendment "seeks to add a completely distinct procedure to their complaint of negligence." Grove v. Carle Foundation Hospital, 364 Ill. App. 3d at 420. Similarly, the original complaint in the instant case focused on the hospital's actions "following [Frigo's] 10/8/98 surgery." As in Grove, these allegations involved a postoperative infection that plaintiff's experts uniformly testified was the cause of plaintiff's amputation.

Silver Cross cites McCorry v. Gooneratne, 332 Ill. App. 3d 935 (2002), for its analysis of the language of section 2-616(b): "The later claim 'grew out of the same *** occurrence' as the claim in the original complaint if the original complaint provided the defendant with all of the information necessary for preparation of the defense for the claim asserted later. Williams v. Board of Education of the City of Chicago, [222 Ill. App. 3d 559, 563 (1991)]. The later claim relates back if the original complaint directs the defendant's attention to the facts on which the plaintiff bases the later claim." McCorry v. Gooneratne, 332 Ill. App. 3d at 943-44. The majority's statement that "Silver Cross was supplied with the essential information it needed to prepare a defense to the management claim in the original complaint" (slip op. at 27) certainly does not meet the standard as set out in McCorry.

Admittedly, the problem here may be that <u>McCorry</u> overstates the burden placed on plaintiffs.

Courts have specifically rejected the assertion that negligent credentialing claims filed after the statute of limitations has run relate back to original complaints alleging a hospital's negligence based on an employment or an agency relationship.

In a case factually very similar to ours, <u>Weidner v. Carle Foundation Hospital</u>, 159 Ill. App. 3d 710 (1987), the plaintiff brought a medical malpractice action against a physician, against a clinic and against a hospital based on an employment or agency relationship. The plaintiff voluntarily dismissed the counts against the physician and the clinic. Summary judgment was entered for the hospital but the patient was granted leave to file an amended complaint. In the amended complaint, the plaintiff alleged that the hospital had a duty of care separate from the physician's duty to his patient to know the qualifications of its staff physicians and their standard of performance. The circuit court dismissed this amended complaint as being untimely and the patient appealed. The appellate court affirmed, holding that the allegations in the amended complaint that the hospital "was negligent for not adequately ascertaining the qualifications of its staff physicians, supervising them, and reviewing their performance" were "separate from the alleged malpractice which led to plaintiff's injuries. The facts established or raising a question of this type of negligence were not asserted in the initial pleadings. Therefore, Carle Foundation Hospital was not placed on notice of the subsequent claim." <u>Weidner v. Carle Foundation Hospital</u>, 159 Ill. App. 3d at 713.

I believe that the holdings of the appellate court in <u>Castro</u>, <u>McArthur</u> and <u>Marek</u>, cited by plaintiff, appear to be in some conflict with the holdings of the appellate court in <u>Grove</u>, <u>McCorry</u> and <u>Weidner</u>, cited by defendant, Silver Cross. Consequently, I believe that our supreme court's holding in <u>Zeh v. Wheeler</u>, 111 Ill. 2d 266 (1986), explaining the rationale behind the relation back doctrine

as codified in section 2-616(b) is most instructive: " '[A] defendant has not been prejudiced so long as his attention has been directed, within the time prescribed or limited to the facts that form the basis of the claim asserted against him.' " Zeh v. Wheeler, 111 Ill. 2d at 273, quoting Simmons v. Hendricks, 32 Ill. 2d 489, 495 (1965).

In the instant case, the plaintiff's initial complaint alleged that Silver Cross "[c]arelessly and negligently managed, maintained, controlled, owned and operated said medical centers in such manner causing the plaintiff to be injured." It would be difficult to imagine language that was more broad and nebulous. If this language is held to be sufficient to put hospitals on notice for the purpose of holding them directly liable for the medical malpractice of the independent contractor physicians who work there, the relation back doctrine will essentially be applicable in all such cases, depriving hospitals of the protection of the statute of limitations and statute of repose as found in section 13-212 of the Code of Civil Procedure (735 ILCS 5/13-212 (West 2000)). Therefore, I respectfully dissent as to the applicability of the statute of limitations defense.