**FIRST DIVISION**
June 25, 2008

No. 1-06-1536

CONNIE LONGNECKER, Individually and as ) Appeal from the
Special Administrator of the Estate of ) Circuit Court of
CARL LONGNECKER, Deceased, ) Cook County.
)
     Plaintiff-Appellant, )
)
  v. ) No. 02 L 007989
)
LOYOLA UNIVERSITY MEDICAL CENTER, and )
SIRISH PARVATHANENI, M.D., ) The Honorable
) Irwin J. Solganick,
     Defendants-Appellees. ) Judge Presiding.

JUSTICE GARCIA delivered the opinion of the court.

Connie Longnecker, individually and as special administrator of the estate of her husband Carl Longnecker, filed suit against Dr. Sirish Parvathaneni and Loyola Medical Center, after Mr. Longnecker died following an unsuccessful heart transplant. During the procedure, Mr. Longnecker received a diseased "hypertrophic heart." He died four days later, never regaining consciousness.

Dr. Parvathaneni acted as the "procuring" or "harvesting" surgeon during the transplant. At trial, the plaintiff presented two theories of liability: (1) Dr. Parvathaneni, as an agent of

No. 1-06-1536

Loyola, committed professional negligence where he failed to properly test and visually inspect the donor heart, and failed to diagnose it as having significant left ventricular hypertrophy and coronary artery disease; and, (2) Loyola committed institutional negligence by failing to ensure that Dr. Parvathaneni understood his role as a procuring surgeon. The jury found in favor of Dr. Parvathaneni and Loyola on the professional negligence claim. The jury found against Loyola on the institutional negligence claim and awarded the plaintiff $2.7 million.

Loyola filed a posttrial motion in which it argued it was entitled to judgment notwithstanding the verdict (judgment n.o.v.), or, in the alternative, a new trial, because (1) the plaintiff failed to plead institutional negligence, (2) the plaintiff failed to produce expert testimony to support institutional negligence, (3) the plaintiff failed to establish breach, (4) the plaintiff failed to establish causation, and (5) the verdicts were inconsistent. The circuit court found the verdict in favor of Dr. Parvathaneni to be irreconcilable with the verdict against Loyola, reasoning if Dr. Parvathaneni had not been negligent, Loyola's failure to ensure he understood his role could not have been the proximate cause of Mr. Longnecker's death. Therefore, the court decided the verdicts were

**2**

No. 1-06-1536

inconsistent. The court vacated the verdict against Loyola and entered judgment for Loyola.

The plaintiff contends on appeal that the jury's verdicts are not inconsistent. She alternatively argues that if the verdicts are inconsistent, the proper remedy is to order a new trial on both causes of action.

Dr. Parvathaneni agrees the verdicts are not inconsistent. In his brief, he points to the "wholly separate theories of liability against Loyola as principal of Dr. Parvathaneni and [liability against] Loyola for institutional negligence," to which two separate standards of care apply.

Loyola's brief intimates that we need not determine whether the verdicts are inconsistent if the circuit court's grant of judgment n.o.v. is proper for other reasons. Loyola focuses on the circuit court's finding that proximate cause was precluded based on the verdict in favor of Dr. Parvathaneni to contend the judgment n.o.v. was proper. Loyola also argues the judgment n.o.v. was proper because the plaintiff failed to establish the element of breach, and because the institutional negligence claim was barred by the statute of limitations. In the alternative, Loyola argues the circuit court correctly found the verdicts to be inconsistent. Loyola concedes that if the verdicts are inconsistent, the proper remedy is to order a new trial on both

3

claims.

For the reasons that follow, we hold the verdicts in this case are not inconsistent, and that no other basis supports the grant of judgment n.o.v. We therefore reverse the decision of the circuit court of Cook County, and remand for further proceedings.

BACKGROUND

Carl Longnecker suffered from numerous coronary ailments, and, by age 58, had suffered three heart attacks.

In 2000, Mr. Longnecker became a patient of Dr. George Mullen, a cardiologist at Loyola. Dr. Mullen told Mr. Longnecker he needed a heart transplant, and placed his name on a donation waiting list.

By 2001, Mr. Longnecker's condition worsened. His "status" on the donation waiting list went from "2 class" to "1B class," moving his name up the list. His chance of surviving one year without a transplant was 30%.

On June 11, 2001, Mr. Longnecker was informed a potential donor heart had been located. He went to Loyola and was prepared for surgery.

A. *Loyola Heart Transplantation Procedures*

Loyola uses a team approach to heart transplantations. The Loyola transplant team consists of a nurse coordinator and three

doctors: the transplant cardiologist, the procuring surgeon, and the transplant surgeon.

The Regional Organ Bank of Illinois (ROBI) also plays a role in Loyola's heart transplantations. When a potential donor is declared brain dead, ROBI gathers information about the donor, including gender, age, and weight, the cause of death, and whether the donor smoked, drank alcohol, or used narcotics. ROBI may also order diagnostic tests of the donor's heart. ROBI then passes any relevant information to Loyola's nurse coordinator, who briefs the transplant cardiologist.

The transplant cardiologist first makes an evaluation, based on the donor's history and the results of any tests, to preliminarily accept or decline the heart. If the heart is preliminarily accepted, the procuring surgeon goes to the donor hospital, where he or she opens the donor's sternum and visually inspects the heart and feels it for defects. Next, the procuring surgeon makes the "final phone call" where he or she reports the findings to the transplant surgeon, who decides whether to accept or reject the heart. If the heart is accepted, the procuring surgeon "cross-clamps" the donor heart, cutting off the blood supply, and flushes it with a preservative solution. The heart is transported to Loyola, where the transplant surgeon, who has removed the patient's "native" heart, transplants the donor

**5**

heart.

Time is of the essence in heart transplantations. A preserved heart can remain viable for approximately four hours after being removed from the donor's body. Thus, the removal of the donor heart and its transport to the recipient hospital must be carefully coordinated with the removal of the recipient's native heart.

B. *The Heart Transplantation in this Case*

In this case, the nurse coordinator was Penny Pearson. Dr. Mullen was the transplant cardiologist. The defendant, Dr. Parvathaneni, was the procuring surgeon, and Dr. Foy, the surgical director of the Loyola transplant team, was the transplant surgeon.

The donor was a 46-year-old male who was declared brain dead at Good Samaritan Hospital. The donor's family informed ROBI he smoked cigarettes and marijuana and drank alcohol regularly, and that he may have used cocaine. The family also revealed the donor was diagnosed with hypertension (high blood pressure) in September 2000. He was "noncompliant" with treatment, meaning he did not take medication regularly.

Based on the donor's history, ROBI ordered diagnostic tests, including an echocardiogram, the "gold standard" test for left ventricle hypertrophy (the enlargement of the heart wall), and an

angiogram, the "gold standard" test for coronary artery disease (plaque in the arteries). The donor's level of troponin, a substance that may be indicative of damaged heart muscle, was also measured.

The echocardiogram revealed the donor's left ventricle measured 1.2 centimeters, meaning he suffered from "mild" left ventricle hypertrophy. The angiogram revealed "mild" coronary artery disease. The donor's troponin level was elevated.

ROBI contacted Pearson with the above information. Pearson then contacted Dr. Mullen, who, after evaluating the echocardiogram and angiogram, and after discussing the matter with Dr. Foy, preliminarily accepted the heart. Dr. Parvathaneni then went to Good Samaritan in order to "visualize" the heart, that is, to inspect it for congenital abnormalities and to confirm the findings of the echocardiogram and angiogram. Dr. Parvathaneni did not have any concerns about plaque or hypertrophy in the heart. Dr. Parvathaneni called Dr. Foy and told him the heart "look[ed] good" and was "suitable for transplantation" from a surgical aspect. Dr. Foy accepted the heart.

At 7:10 a.m., Dr. Parvathaneni cross-clamped the donor's heart, and removed it at 7:30 a.m. By 7:40 a.m., the heart was in route to Loyola, where it arrived at 8:10 a.m.

At 7:48 a.m., while the donor heart was on its way to Loyola, Dr. Foy placed Mr. Longnecker on a bypass machine. At 8:28 a.m., Mr. Longnecker's native heart was cross-clamped and removed. When Dr. Foy removed the donor heart from its container, he immediately saw and determined by touch that it suffered from left ventricular hypertrophy and coronary artery disease. Dr. Foy wrote "Hypertrophic heart!" in his operative note because the amount of hypertrophy was more than he expected based on the results of the echocardiogram. Nevertheless, Dr. Foy determined the heart was suitable for transplant, and transplanted it. The heart, however, never functioned, and, on June 15, 2001, Mr. Longnecker died. Had Mr. Longnecker survived, his name would have been placed back on the heart donation waiting list.

An autopsy revealed the donor heart weighed 492 grams, whereas a normal heart weighs 300 grams. The heart's left ventricle measured two centimeters in thickness, indicating "severe" hypertrophy. The heart also exhibited "moderate to severe" coronary artery disease. The cause of death was determined to be acute myocardial infarction, with left ventricle hypertrophy being an indirect contributing cause.

## C. *Litigation*

On June 24, 2002, the plaintiff filed a three-count

**8**

complaint against Loyola and Dr. Parvathaneni, alleging medical negligence and wrongful death, and seeking recovery under the Family Expense Act (750 ILCS 65/15 (West 2002)).  The plaintiff alleged that Loyola, by and through its agent, Dr. Parvathaneni:

"a.  Failed to perform appropriate

testing of the donor heart;

b.  Failed to perform appropriate visual

inspections of the donor heart;

c.  Fail[ed] to diagnose significant

left ventricle hypertrophy in the donor heart

prior to transplantation;

d.  Fail[ed] to diagnose significant

coronary artery disease in the donor heart

prior to transplantation; [and]

e.  Otherwise deviated from the standard

of care."

On June 10, 2003, the plaintiff filed an amended complaint in which she named as additional defendants others involved in the transplantation.  Prior to trial, the additional defendants were either granted summary judgment or voluntarily dismissed from the case.  The allegations against Loyola and Dr. Parvathaneni were the same in both complaints.  Neither complaint expressly based Loyola's liability on institutional negligence.

On November 29, 2005, one day prior to trial, Loyola filed a motion in limine seeking to bar the plaintiff from presenting evidence of Loyola's institutional negligence because (1) the plaintiff's complaint did not allege institutional negligence, (2) any institutional negligence claim would be time barred, and (3) the plaintiff's expert, Dr. James Avery, lacked the appropriate foundation for his testimony regarding institutional negligence.  The circuit court denied the motion.

On November 30, 2005, the trial commenced.  Dr. Foy testified that he trained Dr. Parvathaneni, who had been a cardiac fellow at Loyola, to procure hearts for transplantation.  Dr. Foy was "quite satisfied" that Dr. Parvathaneni both knew and understood his responsibilities in terms of procuring hearts.  Thus, Dr. Parvathaneni remained on Loyola's staff after his fellowship completed.

Because Loyola used a team approach to organ procurement, each team member was required to know his or her role and perform that role.  According to Dr. Foy, in Loyola's system, the procuring surgeon evaluates the donor heart and is involved in making decisions regarding its suitability for transplant; the procuring surgeon does more than simply remove the heart from the donor's body.  The procuring surgeon is responsible for (1) gathering and reviewing all of the available information about

**10**

the donor, (2) reviewing any echocardiograms and angiograms, (3) visually inspecting the heart for trauma or abnormalities and confirming or denying any abnormalities noted on the echocardiogram or angiogram, and (4) feeling the heart. Dr. Foy did not specify whether the procuring surgeon is required to feel the heart prior to cross-clamp, or whether the examination need be performed after removal. Dr. Foy's "final decision" to accept or reject the heart is based in large part on the procuring surgeon's findings.

In this case, by the time Dr. Foy removed the donor heart from its container, he had already removed Mr. Longnecker's native heart. From the moment Dr. Foy held the donor heart, he knew it had "significant" hypertrophy. Dr. Foy, however, decided to proceed with the transplant. Although Dr. Foy's deposition testimony indicated that "at the time *** the donor heart[] is brought on to the operative field the die is cast, you have no choice but to implant that heart," he testified at trial that he had the option of using "a Jarvick type, total artificial heart."

Dr. Parvathaneni, who is triple board certified in general surgery, critical care, and cardiothoracic surgery, testified that when he arrived at Good Samaritan to procure the heart, he knew Drs. Foy and Mullen had already reviewed the results of the echocardiogram and angiogram, and that Dr. Mullen had "evaluated

**11**

[the] heart and cleared it for transplant." Dr. Parvathaneni testified he also reviewed the echocardiogram and angiogram as part of his duties.

Dr. Parvathaneni distinguished between two potential roles of a Loyola transplantation team member: evaluating a heart for transplant and examining a heart to be transplanted. He testified it was his duty as the procuring surgeon to examine a heart to be transplanted, not to evaluate a heart for transplant. He did not consider himself capable of evaluating a heart for transplant.

According to Dr. Parvathaneni, Loyola's standard practice required procuring surgeons to visually examine the heart and manually assess it for hypertrophy and coronary artery disease before removing the organ. Pursuant to this practice, Dr. Parvathaneni visually inspected the heart while it remained in the donor's chest and felt it for plaque and hypertrophy. He could not recall whether he could feel more hypertrophy or plaque in the heart then indicated in the echocardiogram or angiogram when he placed it in its container.

Dr. Parvathaneni acknowledged that hypertrophy can most easily be felt after the heart is removed. However, Dr. Parvathaneni testified he was not trained to manually inspect the heart after removal. Rather, he was trained "to bring the organ

**12**

as fast as [he] could."  Dr. Parvathaneni explained, "Once we are told to take the heart, we take the heart, bag it up and send it. Time is of the essence, and they're expecting the organ [at Loyola]."

Dr. Mullen, the transplant cardiologist, testified he was aware the donor was 46 years old and had a history of uncontrolled hypertension.  He was also aware the donor suffered from "mild" hypertrophy and "mild" coronary artery disease.  In his opinion, it was proper to accept a heart with these conditions.  Dr. Mullen took "full responsibility" for accepting the donor heart in this case.

Dr. Avery, a cardiovascular surgeon from the California Pacific Medical Center, gave expert testimony on behalf of the plaintiff.  Prior to testifying, Dr. Avery reviewed depositions from Drs. Foy, Mullen, and Parvathaneni, which served as the bases for his opinions.

In Dr. Avery's opinion, the standard of care required Dr. Parvathaneni to review the patient's medical and social history, the echocardiogram and angiogram, to see and feel how the heart worked in the donor's chest, and to come to a conclusion regarding whether to accept the heart.  Dr. Parvathaneni's deposition testimony, however, indicated he did not believe he was required to evaluate the heart at all; rather, he was sent to

**13**

No. 1-06-1536

Good Samaritan "to get the heart and bring it back."  Dr. Parvathaneni's deposition testimony was in conflict with deposition testimony given by Drs. Foy and Mullen that described Dr. Parvathaneni's role as "enormous" in the evaluation of the heart.

According to Dr. Avery, Dr. Parvathaneni deviated from the standard of care by being unaware of "significant historical items" related to the donor, including his history of uncontrolled hypertension, history of cigarette smoking, and potential cocaine use.  Dr. Parvathaneni also deviated from the standard of care by failing to perform a physical examination of the donor heart <u>after</u> the heart was removed.  If Dr. Parvathaneni had done so, he would have found what Dr. Foy later found: "a thick heart of significant hypertrophy and considerable plaque in the coronaries."

Dr. Avery additionally testified the standard of care required Dr. Parvathaneni to understand his role in the transplant as viewed by the other team members.  However, Dr. Parvathaneni's deposition testimony indicated he failed to understand his role, in deviation of the standard of care.

Regarding Loyola, Dr. Avery testified:

> "Q.  And in regards to the Loyola transplant team did the standard of care

**14**

require that they--did they have any responsibility under the standard of care to make sure that Dr. Parvathaneni understood his role if they were going to send him to get a heart?

A. Yes.

Q. And did Loyola deviate from the standard of care in that regard?

MR. PATTERSON [Counsel for Loyola]: Objection your Honor, motion in limine.

THE COURT: Overruled.

A. [Dr. Avery]: In this regard I believe they did.

Q. In what manner?

A. Well, basically everybody needs to be on the same page in terms of what each team member's role is in the team."

In Dr. Avery's opinion, had Dr. Parvathaneni fulfilled his responsibilities pursuant to the standard of care, and had Loyola fulfilled its responsibilities in ensuring Dr. Parvathaneni knew his role, the heart would not have been transplanted.

Dr. Robert Higgins, the chairman of cardiovascular and thoracic surgery and the director of the Heart Transplant and

**15**

Mechanical Assist Device Program at Rush University Medical Center, testified as an expert on behalf of Loyola. Dr. Higgins's opinion, to a reasonable degree of scientific certainty, was that the donor heart was suitable for transplantation. The echocardiogram showed only mild hypertrophy, the angiogram showed only mild coronary artery disease, and the donor's possible cocaine use was not a factor in the donor's death. The heart was also visually suitable for transplantation. Dr. Higgins, however, testified he would not transplant a heart with two-centimeter hypertrophy and severe coronary artery disease.

Dr. Alfred Carl Nicolosi testified as an expert on behalf of Dr. Parvathaneni. According to Dr. Nicolosi, Dr. Parvathaneni complied with the standard of care in his role as a procuring surgeon because he reviewed the echocardiogram and the angiogram, and conducted a visual inspection and physical examination of the heart. According to Dr. Nicolosi, the donor heart was acceptable for transplant, and none of Dr. Parvathaneni's actions caused Mr. Longnecker's death. According to Dr. Nicolosi, the left ventricle of the donor heart measured two centimeters at the autopsy because of swelling, not because of hypertrophy.

At the jury instruction conference, Loyola unsuccessfully objected to instructions on Loyola's institutional negligence.

No. 1-06-1536

The jury was instructed, in part:

"The plaintiff claims that Carl Longnecker died and that defendants Dr. Parvathaneni and Loyola *** were negligent in one or more of the following respects: Failed to properly evaluate the donor heart; failed to perform an appropriate physical examination of the donor heart; failed to communicate significant problems with the donor heart after physical examination; and failed to reject the donor heart for transplantation.

The plaintiff further claims that defendant Loyola *** was negligent in one or more of the following respects: Failed to ensure that Dr. Parvathaneni understood his role as a procuring surgeon.

Negligence by a hospital is the failure to do something that a reasonably careful hospital would do or the doing of something that reasonably careful hospital would not do under the circumstances similar to those shown by the evidence.

**17**

The law does not say how a reasonably careful hospital would act under the circumstances, that is for you to decide."

The jury was not instructed that it could return a verdict in favor of Dr. Parvathaneni only if it also found in favor of Loyola. In fact, the jury instructions allowed the jury to find the way it did.

After initially indicating it could not reach a verdict, the jury found for Dr. Parvathaneni and Loyola on the professional negligence claim, and against Loyola on the institutional negligence claim. The jury assessed $2.7 million in damages.

On Loyola's motion for judgment n.o.v., the circuit court found the verdicts inconsistent, and vacated the verdict against Loyola. The circuit court stated:

"If the institutional negligence in this case is based specifically on the conduct of Dr. Parvathaneni in that he did not understand what his role was and was not--and that Loyola did not make sure he understood his role, well, if the jury found that he wasn't negligent, then, you know, there was nothing wrong with what he did and whether he personally did not understand his role or

**18**

whether Loyola didn't see that he understood his role doesn't matter. He didn't do anything that caused harm to [Mr. Longnecker].

If his actions were not a proximate cause of injury to Mr. Longnecker, even if he was negligent, then if anything that he did didn't cause Mr. Longnecker's death, then, you know, the failure by Loyola to see that he understood what he was doing or knew what he was doing doesn't really matter. Nothing he did was the cause of the injury to Mr. Longnecker. So they really are inconsistent."

The court entered judgment in favor of both defendants. This timely appeal followed.

ANALYSIS

In medical negligence cases, a hospital may face liability under two separate and distinct theories: (1) vicarious liability for the medical negligence of its agents or employees; and (2) liability for its own institutional negligence. Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 211 N.E.2d 253 (1965), cert. denied, 383 U.S. 946, 16 L. Ed. 2d 209,

**19**

No. 1-06-1536

86 S. Ct. 1204 (1966).

In a professional negligence case, the standard of care requires the defendant to act with "the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." Advincula v. United Blood Services, 176 Ill. 2d 1, 23, 678 N.E.2d 1009 (1996). Generally, "expert testimony is necessary in professional negligence cases to establish the standard of care." Snelson v. Kamm, 204 Ill. 2d 1, 43-44, 787 N.E.2d 796 (2003). "[E]xpert testimony is needed *** because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician." Walski v. Tiesenga, 72 Ill. 2d 249, 256, 381 N.E.2d 279 (1978).

Institutional negligence involves an analogous standard of care; a defendant hospital is judged against what a reasonably careful hospital would do under the same circumstances. Illinois Pattern Jury Instructions, Civil, No. 105.03.01 (1995). See generally Jones v. Chicago HMO Ltd. of Illinois, 191 Ill. 2d 278, 294-99, 730 N.E.2d 1119 (2000). Under this theory of liability, however, "the standard of care *** may be shown by a wide variety of evidence, including, but not limited to, expert testimony, hospital bylaws, statutes, accreditation standards, custom and

**20**

community practice." Jones, 191 Ill. 2d at 298. "[T]he institutional negligence of hospitals can also be determined without expert testimony in some cases." Jones, 191 2d at 296.

The concept of proximate cause is the same under professional and institutional negligence. However, consistent with the help lay jurors need "to determine any lack of necessary scientific skill on the part of the physician" (Walski, 72 Ill. 2d at 56), "[t]he proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty." (Emphasis added.) Krivanec v. Abramowitz, 366 Ill. App. 3d 350, 356-57, 851 N.E.2d 849 (2006). We are aware of no authority that imposes a similar rule that proximate cause be established to a reasonable degree of medical certainty in an institutional negligence case. However, an institutional negligence case may present where professional and institutional standards of care are so intertwined that proximate cause is required to be shown to a reasonable degree of medical certainty. The case before us is not such a case. Nor does Loyola contend otherwise.

In this case, the jury rejected the plaintiff's contention that Dr. Parvathaneni (and, vicariously, Loyola) was professionally negligent. The plaintiff does not challenge this finding on appeal. The jury accepted the plaintiff's contention

that Loyola was institutionally negligent.  The circuit court, however, concluded the jury's findings were inconsistent, granted Loyola's motion for judgment n.o.v., and vacated the verdict. The plaintiff challenges this ruling.

A motion for judgment n.o.v. should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."  Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).  Our standard of review is de novo. York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178, 854 N.E.2d 635 (2006).

### I.  Institutional Negligence

In support of affirming the trial court's decision, Loyola puts forth three arguments: (1) the jury should not have considered the institutional negligence claim because the claim was time barred; (2) judgment n.o.v. was proper because the plaintiff failed to establish breach; and, (3) judgment n.o.v. was proper because the plaintiff failed to establish proximate cause.

Before addressing the merits of Loyola's contentions, we address the plaintiff's assertion that Loyola has waived the first two contentions, if not also the third, because it failed

**22**

to obtain a conditional ruling in the circuit court in violation of section 2-1202(f) of the Code of Civil Procedure, which requires the circuit court to "rule conditionally on the other relief sought [in a posttrial motion]."  735 ILCS 5/2-1202(f) (West 2006).  Loyola's posttrial motion, which raised the issues of timeliness, breach, and proximate cause, did not seek other forms of relief.  Rather, Loyola's posttrial motion set forth alternative bases for the same relief--judgment n.o.v. Consequently, Loyola's alternative bases for upholding the judgment n.o.v. are not waived.  Varady v. Guardian Co., 153 Ill. App. 3d 1062, 1070, 506 N.E.2d 708 (1987); Ralston v. Plogger, 132 Ill. App. 3d 90, 97, 476 N.E.2d 1378 (1985).  We address each in turn.

### A.  *Time Barred*

Loyola points out the plaintiff's original and amended complaints did not specifically allege Loyola breached any independent duty of care and, in its view, only alleged Loyola was vicariously liable for Dr. Parvathaneni's alleged malpractice.  Loyola argues, "Even assuming that Plaintiff attempted to amend her complaint at [a later date], any claim of institutional negligence against Loyola would be time barred." Loyola points out the statute of limitations for a medical malpractice claim is two years (735 ILCS 5/13-212(a) (West

2004)), and argues any institutional negligence claim would not "relate back" to the original complaint under section 2-616(b) of the Code of Civil Procedure (735 ILCS 5/2-616(b) (West 2004)).

Section 2-616(b) provides:

> "The cause of action, cross claim or defense set up in any amended pleading shall not be barred by lapse of time under any statute *** prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading ***."  735 ILCS 5/2-616(b) (West 2004).

Loyola mistakenly relies on section 2-616(b) and institutional negligence cases addressing the relation-back doctrine.  See, e.g., Frigo v. Silver Cross Hospital & Medical Center, 377 Ill. App. 3d 43, 62, 876 N.E.2d 697 (2007) (plaintiff's negligent credentialing claim related back to her

**24**

original pleading specifically alleging the hospital committed negligence); Weidner v. Carle Foundation Hospital, 159 Ill. App. 3d 710, 713, 512 N.E.2d 824 (1987) (plaintiff's allegation that the hospital breached its institutional duty of care did not relate back to her original complaint alleging the hospital was vicariously liable for the doctor's malpractice). The relation-back provision of section 2-616(b), by its very terms, applies only in cases where "cause[s] of action, cross claim[s] or defense[s]" are raised beyond the limitations period in "any amended pleading." 735 ILCS 5/2-616(b) (West 2004); Porter v. Decatur Memorial Hospital, 227 Ill. 2d 343, 882 N.E.2d 583 (2008). In this case, the plaintiff did not raise any new claim against Loyola in an amended pleading. Rather, the plaintiff's original and amended complaints, both filed within the two-year limitations period, contained the same allegations against Loyola, and no other amended pleadings were filed. Simply stated, the relation-back doctrine has no application in this case.

What is relevant, however, is whether the plaintiff's timely filed amended complaint contained sufficient facts to put Loyola on notice that the plaintiff sought to hold it liable for institutional negligence. The plaintiff's amended complaint alleged Loyola and Dr. Parvathaneni failed to properly test,

**25**

inspect, and diagnose the donor heart, and that both defendants "[o]therwise deviated from the standard of care." Although the amended complaint did not expressly assert an institutional negligence claim against Loyola, Loyola was on notice of this theory of liability long before the commencement of trial. In her Supreme Court Rule 213 (210 Ill. 2d R. 213) response, the plaintiff disclosed Dr. Avery's opinion on this very point.

> "9. Defendant Loyola University Medical Center, as an institution and through the physicians practicing within the heart transplant unit, had a duty to ensure that each physician and participant in the heart transplant team understood his or her role and what was expected of him or her in the assessment of the donor heart for transplant. This was a deviation from the standard of care on the part of Defendant Loyola University Medical Center."

Loyola's motion in limine to bar Dr. Avery from testifying about institutional negligence confirms that Loyola understood that the plaintiff was proceeding under this separate theory of liability.

We reject Loyola's contention that the plaintiff's

No. 1-06-1536

institutional negligence claim was time barred.

B. *Breach of Duty*

In an institutional negligence case, "[a] hospital owes a duty to its patients to exercise reasonable care in light of apparent risk." Andrews v. Northwestern Memorial Hospital, 184 Ill. App. 3d 486, 493, 540 N.E.2d 447 (1989), citing Ohligschlager v. Proctor Community Hospital, 55 Ill. 2d 411, 303 N.E.2d 392 (1973). Here, the "apparent risk" was that a donor heart with significant hypertrophy would be accepted for transplantation. In order to avoid this risk, the plaintiff asserts Loyola had a duty to ensure that each member of the heart transplant team was fully aware of his role in evaluating the donor heart for transplantation.[1]

According to the plaintiff, Dr. Parvathaneni should have been informed that his role, as part of the transplant team, included evaluating the heart for transplantation after harvesting, not simply examining the heart while in the donor. Had Dr. Parvathaneni evaluated the heart after harvesting, he likely would have made the same observation Dr. Foy made after

---

[1] Loyola makes no claim that the standard of care, itself, was not established by the evidence in light of Dr. Foy's testimony that the procuring surgeon is charged with evaluating the donor heart for transplantation.

**27**

first observing the donor heart, that it was a "Hypertrophic heart!" Dr. Avery, the plaintiff's expert, explained that had Dr. Parvathaneni evaluated the heart after it was removed he would have found: "a thick heart of significant hypertrophy and considerable plaque in the coronaries." Dr. Parvathaneni testified that hypertrophy can most easily be felt after the heart is removed; he, however, was not trained to manually inspect the heart after removal. After removal, his role was "to bring the organ as fast as [he] could" to Loyola. According to Dr. Foy's deposition testimony, he was "surprised" by Dr. Parvathaneni's description of his role because Dr. Parvathaneni played a much greater role in evaluating the donor heart. In his deposition, Dr. Mullen characterized Dr. Parvathaneni's role in evaluating the donor heart as "enormous." As Dr. Avery testified, Loyola owed a duty of reasonable care to Mr. Longnecker to ensure that before his native heart was removed, the donor heart was evaluated as acceptable for transplantation by each member of the transplant team.

Against this record, Loyola makes three arguments to challenge the jury's finding of breach of duty.

First, Loyola argues there is no evidence it knew or should have known about Dr. Parvathaneni's noncompliance with transplant procedures. Loyola cites Pickle, 106 Ill. App. 3d 734, 435

**28**

No. 1-06-1536

N.E.2d 877, <u>Reynolds v. Mennonite Hospital</u>, 168 Ill. App. 3d 575, 522 N.E.2d 827 (1988), and <u>Rohe v. Shivde</u>, 203 Ill. App. 3d 181, 560 N.E.2d 1113 (1990) as support.

In <u>Pickle</u>, the plaintiff sued the doctor and the hospital, alleging he suffered injuries as a result of electroconvulsive therapy. The plaintiff specifically alleged the doctor administered the therapy in a manner that did not comply with the hospital's policies, and the hospital allowed the procedure to be performed in violation of its policies. The circuit court dismissed the complaint and we affirmed. We held the complaint was properly dismissed because the plaintiff failed to allege the hospital knew or should have known the doctor would violate its policies. Our decision in <u>Holton v. Resurrection Hospital</u>, 88 Ill. App. 3d 655, 659, 410 N.E.2d 969 (1980), which held that a hospital has a duty to use reasonable care to discern the medical qualifications of those practicing within the hospital and that a hospital breaches that duty where it allows a doctor to practice where it knows or should know the doctor is unqualified, provided the authority for our holding. We refused to "recognize the existence of a duty on the part of the hospital's administration to insure that each of its staff physicians will always perform his duty of due care," because that would amount to requiring the hospital to act as an insurer of a patient's safety. <u>Pickle</u>, 106

**29**

No. 1-06-1536

Ill. App. 3d at 739.

Similar claims were raised in Reynolds and Rohe. Rohe, 203 Ill. App. 3d at 200 (alleging the defendant hospital allowed a pediatrician to practice where the pediatrician violated several hospital policies); Reynolds, 168 Ill. App. 3d at 577 (alleging the defendant hospitals failed to review and supervise the doctors' work where the doctors misdiagnosed the plaintiffs and performed unnecessary surgery). In both cases, we held the hospitals were entitled to summary judgment because the plaintiffs failed to allege the hospitals were aware of the doctors' actions. Rohe, 203 Ill. App. 3d at 203; Reynolds, 168 Ill. App. 3d at 578-79.

Pickle, Reynolds, and Rohe do not control this case. Each of the three cases involved a "rouge" doctor practicing medicine in violation of the policies set forth by the hospital.

Unaddressed in those cases is the issue here--whether the hospital adequately informed a doctor of his duties while working as a member of a team of doctors. The allegation against Loyola is not that Dr. Parvathaneni harvested hearts in violation of Loyola's policies. Rather, the allegation is that Loyola never informed Dr. Parvathaneni that his duty as a harvesting surgeon encompassed "evaluating a heart for transplantation." The plaintiff's claim of reasonable care owed by Loyola was not to

**30**

insure that each member of the heart transplant team will always perform his duty of reasonable care to his patient; rather, the plaintiff contends Loyola breached its duty to ensure Dr. Parvathaneni knew his role as part of the heart transplant team was not simply to <u>examine</u> but to <u>evaluate</u> the donor heart.

Second, Loyola argues the plaintiff "failed to proffer any evidence that if Loyola had done something differently with respect to the training or supervision of Dr. Parvathaneni, his alleged noncompliance would have been discovered."  Loyola's contention, by linking Loyola's shortfall on "training or supervision of Dr. Parvathaneni" to the discovery of the alleged noncompliance, misses the point.  As we have made clear above, it is not the discovery of Dr. Parvathaneni's "alleged noncompliance" with a Loyola policy that is at issue; rather, at issue is Loyola's alleged failure to ensure Dr. Parvathaneni was aware of its policy that the procuring surgeon had a role in evaluating the heart for transplantation.

Finally, Loyola argues Dr. Avery's testimony was conclusory. Dr. Avery testified Dr. Parvathaneni's deposition testimony conflicted with that of Drs. Foy and Mullen regarding the role of the procuring surgeon.  According to Dr. Avery, Loyola breached the standard of care because "everybody needs to be on the same page in terms of what each team member's role is in the team."

No. 1-06-1536

According to Loyola, "To sustain Plaintiff's burden, Dr. Avery was required to explain specifically how Loyola allegedly breached the applicable standard of care--to identify what Loyola failed to do that a 'reasonably careful' hospital would have done under similar circumstances to ensure that individual members of the Transplant Team understood their respective roles." Loyola again relies on Reynolds.

As discussed above, Reynolds affirmed summary judgment in favor of the defendant hospitals because the plaintiffs failed to establish the defendant hospitals knew or had reason to know of the doctors' alleged malpractice. The court also addressed whether testimony from the plaintiffs' expert was sufficient to establish the hospitals' knowledge. We held it was not. Although the expert opined that the hospitals should have known of the doctors' improper diagnoses of thoracic outlet syndrome, the plaintiffs failed to allege any facts "to substantiate that opinion." Reynolds, 168 Ill. App. 3d at 579. Thus, in Reynolds, the expert asserted a conclusion without factual support that the hospital should have known of the doctors' noncompliance through proper review.

Here, the facts underlying Dr. Avery's opinion go directly to the claimed breach by Loyola of its duty of reasonable care owed to Mr. Longnecker that each team member evaluate the heart

**32**

for transplantation. Dr. Parvathaneni testified he was not trained to "evaluate" the donor heart for hypertrophy even though such an evaluation could be quickly made based on Dr. Foy's immediate observation after removing the donor heart from the transport container that it was a "Hypertrophic heart!" Drs. Foy and Mullen each provided deposition testimony that Dr. Parvathaneni had an enormous role in evaluating the donor heart for transplantation. This enormous role Dr. Parvathaneni was expected to play in evaluating the donor heart for transplantation is confirmed by Dr. Foy's decision to remove Mr. Longnecker's heart <u>before</u> he personally viewed the donor heart.

Dr. Avery's opinion that Loyola breached the standard care by failing to ensure that each member of the transplant team <u>evaluated</u> the donor heart had sufficient factual support in the record to establish that Loyola breached its duty of care to Mr. Longnecker.

### C. *Proximate Cause*

Loyola next argues the plaintiff failed to establish proximate cause. Loyola argues "there was no evidence that if Loyola had done something differently with respect to the training or supervision of Dr. Parvathaneni, then Dr. Parvathaneni and Dr. Foy would have rejected the donor heart for transplantation in Mr. Longnecker." As authority for its "no

**33**

proximate cause" contention, Loyola relies on Snelson v. Kamm, 204 Ill. 2d 1, 787 N.E.2d 796 (2003), a case not involving a claim of institutional negligence.

In Snelson, under Dr. Kamm's care, Snelson underwent a "radiological procedure known as an aortogram or aroteriogram, [performed by a radiologist practicing at the hospital,] to determine the location of arterial blockages." Snelson, 204 Ill. 2d at 10. The procedure was terminated because of the difficulty in inserting "the guide wire." Snelson, 204 Ill. 2d at 10. Dr. Kamm, a general surgeon, was informed that the test was not completed and that Snelson complained of back and abdominal pain following the unsuccessful procedure. Snelson, 204 Ill. 2d at 11. After ameliorative treatments over the course of a day and a half to address Mr. Snelson's severe abdominal pain were exhausted, Dr. Kamm performed emergency exploratory surgery, which revealed portions of the small and large bowel loops were dead. At trial, the radiologist opined that the "unsuccessful *** aortogram caused the death of portions of Snelson's intestine[s]." Snelson, 204 Ill. 2d at 15.

The action against the hospital was based on Snelson's claim that the attending nurses negligently failed to inform Dr. Kamm that they had inserted a catheter before Dr. Kamm ordered one and that Snelson was experiencing high levels of pain. This, Snelson

**34**

contended, affected the treatment he received from Dr. Kamm. Snelson, 204 Ill. 2d at 13. After a verdict was returned against Dr. Kamm and the hospital, the circuit court entered a judgment n.o.v. for the hospital, finding no causal connection between the alleged failures of the nurses and the medical treatment rendered by Dr. Kamm. Snelson, 204 Ill. 2d at 13. The appellate court affirmed. The supreme court granted leave to appeal.

The supreme court began its discussion of Snelson's claim that the judgment n.o.v. was error with observations based on the record evidence. "Snelson acknowledges that he presented no expert testimony indicating that [the hospital's] conduct was a proximate cause of his injury. He also acknowledges that Kamm testified that no act or omission of the nursing staff affected his course of treatment ***. Nevertheless, Snelson argues that a question of fact as to proximate cause was sufficiently established by the evidence." Snelson, 204 Ill. 2d at 42.

Here, Loyola does not assert, nor can it based on the record before us, that the plaintiff acknowledges similar shortfalls in the evidence. Snelson is thus factually distinguishable. We nonetheless address Loyola's contention that under a Snelson-type analysis, proximate cause was not shown here.

According to Loyola, as to Dr. Foy's decision to transplant the donor heart, the record evidence supports but one conclusion:

**35**

"[E]ven though the donor heart had more hypertrophy than Dr. Foy expected based on the echocardiogram, Dr. Foy decided that the heart was acceptable for transplant in Mr. Longnecker." Thus, Loyola argues, because the donor heart was found acceptable for transplantation by Dr. Foy, there was no causal connection between Dr. Parvathaneni's failure to evaluate the heart after harvest and Dr. Foy's decision to transplant the donor heart.

It is true that Dr. Foy testified that he decided the heart was suitable for transplant and that he had the alternative option of using an artificial heart if he found the donor heart unacceptable. Loyola ignores, however, that the jury also had before it Dr. Foy's deposition testimony that once he removed Mr. Longnecker's native heart, "the die is cast, [there is] no choice but to implant [the donor] heart." The discovery by Dr. Foy that the donor heart was hypertrophic was simply too late once the donor heart was on the "operative field." The jury also heard the testimony of Dr. Higgins, an expert called on behalf of Loyola, that he would not transplant a heart with two-centimeter hypertrophy and severe coronary artery disease. At the autopsy, the donor heart measured two centimeters in thickness at the left ventricle and exhibited "moderate to severe" coronary artery disease.

This conflict in the evidence made it a jury question

**36**

whether the alleged breach of Loyola's institutional standard of care proximately caused the death of Mr. Longnecker.

Our conclusion that proximate cause was a question of fact for the jury is supported by the conclusion reached by the supreme court in Jones on the issue of proximate cause in an institutional negligence case. In Jones, in response to Chicago HMO's argument that there was no causal connection between Shawndale's claim and the failure of Chicago HMO to schedule a needed appointment in which Shawndale's illness would have been discovered, the court observed: "We can easily infer from this record that Dr. Jordan's failure to see Shawndale resulted from an inability to serve an overloaded patient population. A lay juror can discern that a physician who has thousands more patients than he should will not have time to service them all in an appropriate manner." Jones, 191 Ill. 2d at 301. This reasonable inference, along with additional evidence in the record that Chicago HMO was soliciting more patients, the supreme court concluded, presented a material question of fact to overcome summary judgment "on Jones' claim of institutional negligence for assigning too many patients to Dr. Jordan." Jones, 191 Ill. 2d at 304.

Likewise here, the jury could have inferred that Dr. Foy removed Mr. Longnecker's native heart, not because it was in

**37**

worse condition than the hypertrophic heart of the donor but because he relied on Dr. Parvathaneni to have informed him if the donor heart were hypertrophic, that is, to a greater degree than indicated in the diagnostic tests of the donor. As the plaintiff claims, had Loyola properly conveyed to Dr. Parvathenani that as part of the transplant team his duties included evaluating the donor heart after harvest, thus leading to the discovery of the significant hypertrophy in the donor heart, "then Dr. Foy would have rejected the donor heart for transplantation in Mr. Longnecker." That the severity of hypertrophy in the donor heart, detected by Dr. Foy immediately upon removing the heart from the transport container, was a shock to Dr. Foy is revealed by the exclamation notation of "Hypertrophic heart!" in his operating notes. The jury was not required to believe Dr. Foy's testimony in court that he found the heart acceptable for transplantation over his deposition testimony that once he removed Mr. Longnecker's native heart, he "had no choice but to implant [the donor] heart." The jury was free to draw the inference from the evidence that Dr. Foy would not have "implant[ed] that heart" had he had a real choice, which a properly trained Dr. Parvathenani would have given him.

Accordingly, there was a causal connection between Loyola's failure to ensure that the entire transplant team was "on the

**38**

No. 1-06-1536

same page" and Mr. Longnecker's death, caused by the transplantation of a nonfunctioning heart.

Finally, the circuit court's conclusion that a verdict in favor of Dr. Parvathaneni precluded a proximate cause showing as to the institutional negligence claim, in the context of this case, is, simply put, wrong. Our supreme court has expressly stated: "Liability is predicated on the hospital's own [institutional] negligence, not the negligence of the physician." Jones, 191 Ill. 2d at 292. "[T]he tort of institutional negligence 'does not encompass, whatsoever, a hospital's responsibility for the conduct of its *** medical professionals.' " Jones, 191 Ill. 2d at 298, quoting Advincula, 176 Ill. 2d at 31.

To hold Dr. Parvathaneni liable, the jury would have had to conclude that he deviated from the professional standard of care to which a procuring surgeon is held. The standard of care for Loyola as to the institutional negligence claim required a showing of what a reasonably careful hospital would do under the circumstances of this case. If, in fact, as the circuit judge concluded, before institutional negligence can be found, professional negligence on the part of Dr. Parvathaneni must be found, the claims of professional negligence and institutional negligence would conflate into a single theory of vicarious

**39**

liability.  Dr. Parvathaneni's commission of medical malpractice would impose vicarious liability on Loyola, as principal to Dr. Parvathaneni, and render the claim of institutional negligence against Loyola pointless.  The two claims, however, are independent, as our supreme court has made clear.  Because the jury found in favor of Dr. Parvathaneni, it does not follow that the jury was compelled to find in favor of Loyola on the institutional negligence claim.  See Collins v. Roseland Community Hospital, 219 Ill. App. 3d 766, 775, 579 N.E.2d 1105 (1991) (verdicts not inconsistent because care provided at hospital involved health professionals "requiring differing degrees of care and subject to differing standards of care").  Under the facts of this case no such outcome was required.  The jury was properly instructed that Loyola alone could be found liable under the institutional negligence theory and the jury so found.

The circuit judge, in concluding the verdict in favor Dr. Parvathaneni and the verdict against Loyola could not stand, may have been thinking of a case like Frigo, where the plaintiff asserted a negligent credentialing claim in the context of institutional negligence, involving a podiatrist, a nonemployee of the hospital.  Frigo, 377 Ill. App. 3d 43.  If the plaintiff successfully established a deviation of the standard of care of

the hospital resulting in wrongly extending credentials to the podiatrist, then to establish proximate cause for the injury inflicted on the plaintiff by the podiatrist on the independent institutional claim, the plaintiff would also have to establish that the podiatrist committed medical malpractice that gave rise to the plaintiff's injuries. Frigo, 377 Ill. App. 3d at 74-75. If the podiatrist did not commit medical negligence, there would be no causal connection between the hospital's action in negligently giving surgical privileges to the podiatrist and the injuries the plaintiff suffered. Frigo, 377 Ill. App. 3d at 75.

Frigo, is much like Reynolds, the case upon which the dissent so heavily relies. In each case, the plaintiff was required to prove malpractice by the offending doctors. In Frigo, the plaintiff had to prove the podiatrist committed malpractice in order to succeed on her institutional negligence claim against the hospital. In Reynolds, the plaintiffs were required to prove not only that the surgeons "were negligent in their diagnoses of these plaintiffs" but "that the hospitals should have known, through proper review procedures, that the surgeons were improperly diagnosing thoracic outlet syndrome." Reynolds, 168 Ill. App. 3d at 579.

Here, the plaintiff's institutional claim was based on Loyola's deviation from the standard of care, not on any claimed

**41**

deviation of the standard of care by Dr. Parvathaneni. In fact, the jury found Dr. Parvathaneni did not commit medical malpractice, a verdict supported by the evidence as the plaintiff concedes. The focus of the plaintiff's institutional negligence claim against Loyola is entirely on Loyola's training of Dr. Parvathaneni, as the harvesting surgeon of the heart transplant team. Even if "notice" under Reynolds were at the crux of the plaintiff's claim, it is disingenuous for Loyola to suggest that it did not have "notice" that Dr. Parvathaneni was not trained to evaluate the donor heart after harvesting when Loyola itself trained Dr. Parvathaneni in his role as the harvesting surgeon of the transplant team. It is no more plausible that Loyola had no such notice than that Loyola was unaware heart transplants were taking place in its hospital. As we have made clear, the instant case is like neither Reynolds nor Frigo.

The dissent intimates that Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 691 N.E.2d 1 (1997), provides guidance on proximate cause in this case.[2] We find no

_____

[2] We find no legal significance to the dissent's observations that "there is no expert testimony of how long the decedent could have lived; how long it would have taken to obtain a new donor; or if the decedent was placed on a Jarvik-type artificial heart, how long could the decedent live with the

**42**

factual similarities between Aguilera and the case before us. There is a life and death difference between a claim based on a delay in ordering a CT scan that would have revealed a brain hemorrhage that might or might not be operable and a claim that Loyola removed a functioning heart (albeit, one that gave Mr. Longnecker a 30% chance of surviving one year) and replaced it with a nonfunctioning heart resulting in Mr. Longnecker's death four days later.

It was for the jury to determine whether there was sufficient evidence of the breach of duty by Loyola and whether there was a causal link between that breach and Mr. Longnecker's death. Based on the record evidence and the reasonable inferences that may be drawn therefore, we cannot say "no

artificial heart." (Slip op. at ___.) Much like Dr. Foy's decision to remove Mr. Longnecker's heart before discovering the donor's hypertrophic heart, the dissent's unanswered questions focus the analysis too late in the sequence of events. The plaintiff's claim is that Mr. Longnecker's native heart should never have been removed in the first instance when all Loyola had to replace it with was a hypertrophic heart or other limited measures that would not have returned Mr. Longnecker to the position he was in before he was admitted to Loyola for a heart transplant.

contrary verdict based on that evidence could ever stand." Pedrick, 37 Ill. 2d at 510. Loyola was not entitled to judgment n.o.v. on proximate cause.

## II. Legally Inconsistent Verdicts

Dr. Parvathaneni contends the verdicts are not inconsistent because different standards of care are involved in medical negligence and institutional negligence. Collins, 219 Ill. App. 3d at 775, 579 N.E.2d 1105 (1991) (verdicts not inconsistent because care provided at hospital involved health professionals "requiring differing degrees of care and subject to differing standards of care"). The plaintiff contends the verdicts are not inconsistent because " 'the same element [was not] found to exist and not to exist.' " Redmond v. Socha, 216 Ill. 2d 622, 649, 837 N.E.2d 883 (2005), quoting Black's Law Dictionary 1592 (8th ed. 2004). Loyola contends "[t]he verdict in favor of Dr. Parvathaneni broke any possible causal link between Loyola's conduct and Mr. Longnecker's injuries."

Loyola's argument is in effect the reasoning of the circuit judge that the verdicts were irreconcilable because the verdict in favor of Dr. Parvathaneni precluded a showing of proximate cause in the claim against Loyola, which we have already rejected. Loyola presents no additional argument that we need address on its claim of inconsistent verdicts.

**44**

No. 1-06-1536

We also note that a holding of legally inconsistent verdicts, under supreme court precedent, mandates that <u>both</u> verdicts be vacated and a new trial ordered against Loyola and Dr. Parvathaneni. <u>Redmond</u>, 216 Ill. 2d at 651 ("once a trial court determines that jury verdicts are legally inconsistent, whether to grant a new trial is not up to the trial court's discretion. It is mandatory"). The jury found the plaintiff failed to prove her case against Dr. Parvathaneni. The plaintiff does not contest this verdict but agrees with Dr. Parvathaneni's contention that "there was evidence from which the jury could conclude that Parvathaneni was not negligent." Vacating the jury's verdict in favor of Dr. Parvathaneni and remanding for a new trial against him would be unjust in this case.

CONCLUSION

For the reasons stated above, the order of the circuit court of Cook County is reversed and the matter is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

CAHILL, P.J., concurs.

R. GORDON, J., dissents.

**45**

JUSTICE ROBERT E. GORDON, dissenting:

I respectfully dissent from the majority opinion where they find that plaintiff proved an institutional negligence case against Loyola University Medical Center (Loyola). I believe the trial judge's decision should be affirmed; however, I agree that the verdicts were not inconsistent.

Illinois has long recognized that a hospitals may be held liable for its own negligence. In Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 333 (1965), our Illinois Supreme Court acknowledged an independent duty of hospitals to assume responsibility for the care of their patients. "Ordinarily, this duty is administrative or managerial in character." Jones v. Chicago HMO Ltd., of Illinois, 191 Ill. 2d 278, 291 (2000), citing Advincula v. United Blood Services, 176 Ill. 2d 1, 28 (1996). To fulfill its duty, a hospital must act as a "reasonably careful hospital" would under similar circumstances. Advincula, 176 Ill. 2d at 29. Liability is predicated on the hospital's own negligence, not the negligence of the physician. Jones, 191 Ill. 2d at 284. This independent negligence of the hospital is known as institutional negligence or direct corporate negligence.

In a medical negligence case, a plaintiff must prove by a preponderance of the evidence that: (1) the defendant owed a duty of care; (2) the defendant breached that duty; and (3) the plaintiff's resulting injury or death was proximately caused by the breach. Hooper v. County of Cook, 366 Ill. App. 3d 1, 6 (2006). I find no evidence in the record of this case of either a breach of duty or causation. Plaintiff's expert, Dr. Avery, testified that Loyola breached its duty because "basically everybody needs to be on the same page in terms of what each team member's role is in the team." Dr. Avery's testimony concerning the "same page" was based on the fact that Drs.

**46**

Foy and Mullen described the role of a procuring surgeon under the Loyola system differently than Dr. Paravataneni did. Reynolds v. Mennonite Hospital, 168 Ill. App. 3d 575 (1988) is instructive as to whether the evidence in this case could support a verdict against Loyola for its claimed failure to instruct Dr. Paravathaneni about his role on the heart transplant team. In Reynolds, plaintiffs alleged that the hospital was institutionally negligent because it failed to implement or follow standards of review to ensure the competency of its surgeons to diagnose thoracic outlet syndrome. Reynolds, 168 Ill. App. 3d at 578-79. The appellate court affirmed the trial court's entry of summary judgment for the hospital because there was no evidence that would have placed the hospital on notice of any malpractice by the surgeons. Reynolds, 168 Ill. App. 3d at 580. In Reynolds, the plaintiff's expert opined that the hospital should have known, through proper review procedure, that its surgeons were improperly diagnosing thoracic outlet syndrome; but the trial court concluded that the plaintiff's expert's testimony was insufficient because there were no facts to substantiate that opinion. Reynolds, 168 Ill. App. 3d at 579-80. See also Rohe v. Shivde, 203 Ill. App. 3d 181, 202 (1990) (plaintiff presented no evidence that the hospital failed to review the performance of the attending pediatrician as to her compliance with hospital policy in examining newborn infants).

In the case at bar, there was no evidence that Loyola knew or should have known if Dr. Paravathaneni had ever deviated from Loyola's institutional policies or did not understand his role on the heart transplant team. Plaintiff's expert needed to identify what Loyola failed to do that a "reasonably careful" hospital would have done under similar circumstances. Advincula, 176 Ill. 2d at 29.

**47**

However, even if plaintiff was able to show the second element, namely a breach of the standard of care, there was no evidence of the third element, namely, a causal relationship between an alleged breach of duty and the death at issue. " '[I]n order to sustain the burden of proof, a plaintiff's expert must demonstrate within a reasonable degree of medical certainty that the defendant's breach in the standard of care is more probably than not the cause of the injury.' " Bergman v. Kelsey, 375 Ill. App. 3d 612, 625 (2007), quoting Knauerhaze v. Nelson, 361 Ill. App. 3d 538, 549 (2005).

Even if Dr. Paravathaneni had been properly advised of his role to evaluate the donor's heart for transplant purposes and advised Dr. Foy of his findings, there is no evidence that Dr. Foy would not have used the donor's heart. Plaintiff's expert, Dr. Avery, testified that if Dr. Paravathaneni had evaluated the donor heart after it was removed and before he made the "final phone call" to Dr. Foy, he would have found what Dr. Foy later found: "a thick heart of significant hypertrophy and considerable plaque in the coronaries." Even though the donor heart had more hypertrophy than Dr. Foy expected based on the echocardiogram, Dr. Foy knew this and still decided that the heart was acceptable to transplant to the decedent. Dr. Foy rejected the option of using an artificial heart instead.[3] Dr. Foy made his decision based on the decedent's grave medical condition resulting from his failing heart.

The evidence in the record further indicates that after the heart was removed, Dr. Paravathaneni found even more hypertrophy than he initially observed. The record contains no

---

[3] If Dr. Foy found that the donor's heart was not suitable, he testified he could have placed the decedent on a Jarvik-type artificial heart.

medical testimony concerning the effect of those observations or their medical significance for causation.

After Dr. Paravathaneni removed the donor heart and made the telephone call to the hospital, Dr. Foy removed the decedent's heart and placed the decedent on the heart machine. If the donor's heart was not used, there is no expert testimony of how long the decedent could have lived; how long it would have taken to obtain a new donor; or if the decedent was placed on a Jarvik-type artificial heart, how long the decedent could have lived with the artificial heart.

This was a complex medical malpractice case that required a medical basis for the expert's opinion that Loyola's breach of duty was a cause of the decedent's death; and it is not found in this record.

Dr. Avery's testimony concerning causation was limited to the following:

"Q. Was Mr. Longnecker's death caused as a result of the

deviations from the standard of care that we talked about today?

A. I believe they are."

There was no basis for that opinion; and as a result, the element of causation was lacking. "An expert's opinion is only as valid as the basis and reasons for the opinion." Wilson v. Bell Fuels, Inc., 214 Ill. App. 3d 868, 875 (1991), citing McCormick v. Maplehurst Winter Sports, Ltd., 166 Ill. App. 3d 93, 100 (1988). "A party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion." Petraski v. Thedos, No. 1-06-2914, slip op. at 11 (Ill. App. Ct. March 31, 2008), citing Turner v. Williams, 326 Ill. App. 3d 541, 552-53 (2001).

In Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 968 (1997),

**49**

the plaintiff's decedent was taken to the emergency room complaining of numbness on the right side of his body. About six or seven hours later, a CT scan was taken, revealing a brain hemorrhage. Aguilera, 293 Ill. App. 3d at 969. The patient died a few days later. Aguilera, 293 Ill. App. 3d at 969. Plaintiff presented two experts who testified that the emergency room physician's delay in taking the CT scan caused the decedent's death. Aguilera, 293 Ill. App. 3d at 969. It was the plaintiff's theory that a diagnosis of the condition would have triggered surgical intervention to prevent the decedent's death. Aguilera, 293 Ill. App. 3d at 969-70. However, on cross-examination, plaintiff's experts admitted that they would defer to a neurosurgeon as to whether surgery should have even been performed; yet the only neurosurgeons testifying in the case stated that surgery would not have been appropriate. Aguilera, 293 Ill. App. 3d at 969-70. This court held that the opinions offered by the plaintiff's experts lacked a sufficient factual basis and were therefore based on conjecture. Aguilera, 293 Ill. App. 3d at 975.

There just is not enough evidence in the record concerning breach of duty and causation for this court to reverse the decision of the trial court. I would affirm.

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**CONNIE LONGNECKER, Individually and as Special Administrator of the Estate of CARL LONGNECKER, Deceased,**
      **Plaintiff-Appellant,**
**v.**
**LOYOLA UNIVERSITY MEDICAL CENTER, and SIRISH PARVATHANENI, M.D.,**
      **Defendants-Appellees.**

**No. 1-06-1536**
**Appellate Court of Illinois**
**First District, First Division**
**Filed: June 25, 2008**

**JUSTICE GARCIA delivered the opinion of the court.**
**CAHILL, P.J., concurs.**
**R. GORDON, J., dissents.**

**Appeal from the Circuit Court of Cook County**
**Honorable Irwin J. Solganick , Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF - APPELLANT** | **Michael W. Rathsack**<br>**Tom Leahy**<br>**Peter D. Hoste**<br>**111 West Washington Street, Suite 962**<br>**Chicago, Illinois 60602** |
| **For DEFENDANT - APPELLEE, Sirish Parvathaneni, M.D.** | **Krista R. Frick**<br>**John M. Stalmack**<br>**Bollinger, Ruberry & Garvey**<br>**500 West Madison, Suite 2300**<br>**Chicago, Illinois 60661** |
| **For DEFENDANT - APPELLEE, Loyola University Medical Center** | **Thomas J. Burke, Jr.**<br>**Ben Patterson**<br>**Hall Prangle & Schoonveld, LLC**<br>**200 South Wacker Drive, Suite 3300**<br>**Chicago, Illinois 60606**<br><br>**Eugene A. Schoon**<br>**Sherry A. Knutson** |

**Sidley Austin, LLP**
**One South Dearborn Street**
**Chicago, Illinois 60603**